964 A.2d 258

**Stefanie HEGER**

v.

**Bryan HEGER.**

**Nos. 1117, 2503 Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Feb. 3, 2009.

84

86

---

Monica N. Hall, Annapolis, for Appellant.

Harold B. Murnane, III, Glen Burnie, for Appellee.

Panel: HOLLANDER, MEREDITH and CHARLES E. MOYLAN, JR., (Retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., J., Retired, Specially Assigned.

In determining the marital share of an asset such as a pension, Maryland domestic relations law utilizes a fraction to which it has attached the label "the *Bangs* formula." This appeal is an occasion for a careful exegesis both of what *Bangs v. Bangs,* 59 Md.App. 350, 356, 475 A.2d 1214 (1984), expressly said and also of what *Bangs v. Bangs* necessarily implied with respect to such a fraction.

The appellant, Stefanie Heger ("Wife"), and the appellee, Bryan Heger ("Husband"), were married on November 16, 1990, in Anne Arundel County. Two children were born of the marriage. The parties separated on November 15, 2003. On May 17, 2004, the Husband and Wife entered into a formal Parenting Plan, reached as a result of mediation, by which they were to share joint legal custody of the children but by which primary physical custody was to be with the Husband. The Parenting Plan was enrolled as a court order on June 11, 2004.

### The Wife

Shortly after the Wife left the family home, she moved to the State of Indiana. That move by her was reflected in the Parenting Plan, as it provided for visitation of the children with her for a period of three weeks (broken down into two segments) each summer and also for her "to have a long weekend once a month with the children whenever possible."

## The Husband

From 1977 through October 2003, the Husband was employed as an Anne Arundel County police officer. Over the course of that employment, the Husband sustained various physical injuries, including a broken right knee, a broken right hand, a torn Achilles tendon in the left ankle, and several serious injuries to the back resulting in two herniated disks. The back injuries necessitated several surgeries, including a laminectomy and a fusion with titanium rods and screws put into his back. After the fusion operation, the Husband was approached by Anne Arundel County to discuss the possibility of a disability retirement. At that point, the Husband was eligible for regular retirement as of 1997. He and the Wife discussed the pluses and minuses of regular retirement versus disability retirement. Because the disability retirement benefits were greater each month and were not taxed, the Husband and Wife jointly agreed that the Husband should choose that option. By the time the parties were divorced on June 12, 2007, the Husband's police department service during the period of the parties' marriage amounted to 12 years and 11 months.

## The Divorce

The Husband filed his Complaint for an Absolute Divorce on December 24, 2006. The Husband requested 1) that the Parenting Plan be incorporated but not merged into the divorce decree; 2) child support; 3) a contribution from the Wife for the children's medical expenses and health insurance; 4) use and possession of the family home; and 5) attorney's fees and costs. On April 4, 2006, the Wife filed a Counterclaim for Absolute Divorce. A trial on the merits was held before Judge Ronald A. Silkworth in the Circuit Court for Anne Arundel County on December 6 and 7, 2006, and January 24 and 25, 2007.

On June 12, 2007, Judge Silkworth issued a Judgment of Divorce Absolute and a meticulously thorough 37–page Memorandum Opinion, filed by the clerk on June 15, 2007. The divorce was granted to the Husband on the basis of two years

of voluntary separation. The Parenting Plan was incorporated into the divorce decree, whereby the Husband continued to have the primary physical custody of the two sons. The Wife was ordered to pay child support in the amount of $836.00 per month. In terms of a monetary award, Judge Silkworth ordered that the Husband shall pay to the Wife, "as an adjustment of the equities, a monetary award in the amount of $28,403."

One other order of Judge Silkworth is pertinent to this appeal. In his Order of June 12, 2007, Judge Silkworth had ordered the Husband to pay to the Wife "a 32% share of his pension payments." As a result of a Motion to Revise Judgment filed by the Husband on July 31, 2007, pursuant to Rule 2–535, alleging a mathematical error in the calculation of the marital portion of the Husband's disability pension, Judge Silkworth issued an Amended Judgment of Absolute Divorce on August 31, 2007. The only change was to substitute "a 25% share of his pension payments" for the earlier "32% share."

## The Contentions

On this appeal, the Wife raises essentially the five questions:

1. Did the Circuit Court err in its determination of the marital property value of the home located at 2932 Golden Fleece Drive, Pasadena, Maryland 21122?

2. Did the Court err in denying the Appellant's request to be named beneficiary of the Appellee's survivor benefit?

3. Did the Court err in failing to grant to the Appellant the federal and state income tax dependency exemptions for the parties' two children?

4. Did the Court err in denying the Appellant's request for an award of attorney's fees and costs?

5. Did the Court err in issuing its Amended Judgment of Absolute Divorce dated August 31, 2007?

### 2932 Golden Fleece Drive

■ The Wife's primary contention is that Judge Silkworth erroneously undervalued the marital property value of the family home at 2932 Golden Fleece Drive. The Husband and Wife purchased 2932 Golden Fleece Drive on November 25, 1991, for $170,000. The property was deeded to the Husband in his name alone. It was uncontroverted that the Husband paid the down payment of $55,000 from non-marital funds that he had received from the sale of a home that he had owned prior to the 1990 marriage of the parties. The remaining $115,000 of the purchase price was financed by a mortgage in the Husband's name. It was not contested that 32.4% of the purchase price came solely from non-marital funds. The parties stipulated that, as of the time of the divorce, the Golden Fleece property had a value of $360,000, subject to a mortgage and two home equity lines of credit for a total indebtedness of $313,677. Judge Silkworth found that the Husband's non-marital 32.4% of the stipulated value of $360,000 was $116,640. See *Grant v. Zich*, 300 Md. 256, 269, 477 A.2d 1163 (1984); *Harper v. Harper*, 294 Md. 54, 80–81, 448 A.2d 916 (1982).

Judge Silkworth's Memorandum Opinion clearly set out the initial situation with respect to the family home.

Mr. Heger alleged that a portion of Golden Fleece was non-marital. He testified that the parties resided in a home referred to as the Linda Avenue property after their marriage in November of 1990. The Linda Avenue home was built on property that Mr. Heger received from his family's farm. On November 22, 1991, Mr. Heger sold the Linda Avenue property to the State of Maryland and received net proceeds of $95,347.44 after the mortgage on Linda Avenue was satisfied.

On November 25, 1991, he purchased Golden Fleece for $170,000.00. He testified that the sum of $55,000.00 from the proceeds of Linda Avenue was used as a down payment on Golden Fleece. He financed the remaining $115,000.00 with a mortgage. Therefore, approximately 32.4% of the pur-

chase price of the marital home came solely from non-marital funds.

Judge Silkworth then followed the guidelines of *Grant v. Zich, supra,* in calculating the net marital value of the Golden Fleece property after the remaining mortgage debt and the two home equity lines of credit had been subtracted and concluded that "for marital value purposes, Golden Fleece is valued at zero."

The Court finds that *Grant v. Zich,* 300 Md. 256 [477 A.2d 1163] (1984) is instructive regarding the appropriate way to calculate the marital and non-marital portion of the home in this case. In this case, the Court of Appeals stated:

> Property is nonmarital in the ratio that the nonmarital investment bears to the total nonmarital and marital investment in the property. To the extent that property is nonmarital, its value is not subject to equitable distribution. Property is marital in the ratio that the marital investment bears to the total nonmarital and marital investment in the property. To the extent that the property is marital, its value is subject to equitable distribution.

> The following example illustrates the proper application of these principles. A husband and wife acquired real property for a purchase price of $40,000. The wife contributed a down payment of $10,000 from property that she acquired prior to marriage. The remaining $30,000 was financed by a mortgage signed by both the husband and the wife. One-quarter of the value of the property is the wife's nonmarital property and three-quarters of the value of the property is marital property.

> If, at the time of the dissolution of the marriage, the property has appreciated in value to a fair market value of $60,000 and the mortgage indebtedness has been reduced to $20,000 by the payment of $10,000 of marital funds, the following division would be appropriate. *One-quarter of the $60,000 fair market value of the property, or $15,000, would be the wife's nonmarital property, not*

*subject to equitable distribution. From the remaining $45,000, $20,000, representing the unpaid mortgage balance, would be deducted leaving $25,000 as the net value of the marital property subject to equitable distribution. Id. at 276 [477 A.2d 1163].*

In the case at hand, the Court finds that there is a non-marital interest of $55,000.00, which was 32.4% of the value of Golden Fleece at the time it was purchased for $170,000.00. Therefore, *the Court has taken 32.4% of the stipulated value of the home, $360,000.00, which equals $116,640.00. Subtracting the amount of Mr. Heger's non-marital interest from the value of the home leaves $243,360.00. However, in accordance with the method set forth in Grant, the Court must account for the three liens, totaling $313,677.00. Because there is no money leftover from the $360,000.00 value after Mr. Heger's non-marital portion is accounted for and after the liens are accounted for, there is no value available for equitable distribution.* Accordingly, *for marital value purposes, Golden Fleece is valued at zero.* The Court will take into account Mr. Heger's non-marital portion when considering the value of all property interests of each party pursuant to factor eleven of the monetary award statutory considerations.

(Emphasis supplied).

Once the Husband's non-marital interest of $116,640 in 2932 Golden Fleece Drive was subtracted from the $360,000 value of the home, the remaining marital value of the property was $243,360. Judge Silkworth expressly found as a fact that offsetting that value of the property were 1) the remaining balance due on the mortgage of $267,064, 2) a post-separation first line of credit with an unpaid balance of $26,227, and 3) a post-separation second line of credit with an unpaid balance of $20,385, for a total marital indebtedness on the property of $313,677. That more than equaled the marital value of the property of $243,360. The evidence with respect to the frequent and regular refinancing of the property over the course of the marriage was, to be sure, chaotic and vague. From the cross-examination of the Husband by the attorney for the

Wife, however, it clearly appears that even the Wife's position recognized that as of the time of the couple's separation in November of 2003, the original 1991 mortgage of $115,000 had grown, through refinancing, to one of approximately $220,000, plus, as of that time, a Sears credit card debt of $9,430 and a Chase credit card debt of $4,317.

There was abundant testimony, moreover, to support Judge Silkworth's conclusion in his Memorandum Opinion that the two post-separation lines of credit were taken out in order to pay off or refinance existing marital credit card debt, car loans for cars that were marital property, home maintenance, and the replacement of furniture the Wife had taken after the separation. The Wife offered no evidence to refute this. Indeed, the Wife's attack on the evidence of the use of the funds to pay off marital indebtedness was confined to the fact that the evidence consisted largely of the Husband's testimony and that that testimony was not adequately corroborated by the production of receipts. She offered no counterevidence of her own, but simply argued:

> The Appellee was asked several times on cross examination about his specific uses of the funds obtained from the post-separation refinancings of the home. *The Appellee provided some tentative testimony about his use of the funds from the January/February, 2004, refinancing and some testimony about his use of the BB & T loan monies.* His witness, Shelley Powell, testified briefly about a new jacuzzi installed by the Appellee after the parties' separation. *However, the Appellee did not produce any receipts in support of his claims* and, when this issue became a point of great contention, near the end of the trial, *the Appellee specifically declined the Court's offer of a further opportunity to provide the receipts and proofs of his expenditures.*

(Emphasis supplied).

That had nothing to do, of course, with the admissibility of the evidence or with Judge Silkworth's entitlement to be persuaded by it. The Wife's attack does not hit the pertinent target, and we cannot say that Judge Silkworth's fact-finding,

out of a daunting welter of ambiguous evidence, was clearly erroneous.

### The Dissipation of Marital Assets

The Wife contends that the diminution of the remaining marital value of 2932 Golden Fleece Drive was erroneous, at least in part although not entirely. The debts, of course, had accrued prior to the actual divorce and the general rule, expressed in *Gravenstine v. Gravenstine,* 58 Md.App. 158, 177, 472 A.2d 1001 (1984), is that those debts would be subtracted before the marital property could be valued.

It is our view that *the marital property* which generates a monetary award *must ordinarily exist as "marital property" as of the date of the final decree of divorce* based on evidence adduced at the trial on the merits or a continuation thereof. Therefore, *property disposed of before commencement of the trial under most circumstances cannot be marital property.* Although "marital property" is defined as "all property, however titled, acquired by either or both spouses during their marriage ...," *the legislative scheme* of the 1978 Marital Property Act *contemplates determination of marital property at the time the marriage is dissolved,* i.e., *when the absolute divorce is granted.*

(Emphasis supplied.

There is, however, a recognized exception to the general calculation guidelines described in *Gravenstine,* and that is where one spouse has improperly dissipated some of the property. Although counsel for the Wife now downplays the significance of her having relied on a dissipation argument, Judge Silkworth's conclusion that she was making a dissipation argument cannot be lightly discounted. As counsel for the Wife argued her claim before Judge Silkworth, she expressly argued dissipation.

He had a purchase money mortgage, and then *he refinanced, attempting to defeat her marital interest in the home via the refinanced amount.* The Court of—I don't remember if it is the Court of Appeals or *the Court of*

*Special Appeals, said "No, that's dissipation." It was considered a dissipated amount of a marital asset....*

. . . .

We will show that he took—the marital assets, in addition to—there are at least six financings around shortly before the separation, or after the separation. *He refinanced to dissipate the marital asset, to turn it into nothing, because he felt that the Court—which is what he is asking the Court to do today—would look at the amount of the mortgages, and subtract the current mortgage balance from the fair market value, and that would leave my client with nothing. And that is exactly what the Rogers case addressed.*

(Emphasis supplied).

In *Choate v. Choate,* 97 Md.App. 347, 366, 629 A.2d 1304 (1993), Judge Rosalyn Bell discussed the dissipation of assets. She also pointed out that the burden of proof on such a charge is on the party alleging such dissipation.

As a general rule, property disposed of before trial cannot be marital property. *Gravenstine v. Gravenstine,* 58 Md. App. 158, 177, 472 A.2d 1001 (1984). *An exception to this rule is where one spouse claims that the property was improperly dissipated by the other spouse.* See *Rock v. Rock,* 86 Md.App. 598, 618–20, 587 A.2d 1133 (1991). Once improper dissipation is alleged, *the burden shifts to the spouse claiming that dissipation occurred to prove that the other spouse used the marital property during the marriage to prevent inclusion of the assets for any consideration of a monetary award.*

(Emphasis supplied).

*Jeffcoat v. Jeffcoat,* 102 Md.App. 301, 311, 649 A.2d 1137 (1994), also addressed the allocation of the burden of proof.

*The burden of persuasion and the initial burden of production in showing dissipation is on the party making the allegation. That party retains throughout the burden of persuading the court that funds have been dissipated,* but after that party establishes a prima facie case that monies

have been dissipated, i.e. expended for the principal purpose of reducing the funds available for equitable distribution, the burden shifts to the party who spent the money to produce evidence sufficient to show that the expenditures were appropriate.

(Emphasis supplied).

 In litigating a claim that one spouse has dissipated marital assets, the critical time is that between the separation or the time when "the marriage is undergoing an irreconcilable breakdown," *Sharp v. Sharp*, 58 Md.App. 386, 401, 473 A.2d 499 (1984), on the one hand, and the ultimate divorce, on the other hand. The other critical factor is the purpose on the part of the spending spouse for the expenditure. What matters is not that one spouse has, post-separation, expended some of the marital assets, what is critically important is the purpose behind the expenditure. The doctrine of dissipation is aimed at the nefarious purpose of one spouse's spending for his or her own personal advantage so as to compromise the other spouse in terms of the ultimate distribution of marital assets.

*Sharp v. Sharp*, 58 Md.App. at 401, 473 A.2d 499, defined dissipation.

"Dissipation may be found where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage...."

It had earlier explained:

"[W]here a chancellor finds that property was *intentionally dissipated in order to avoid inclusion of that property towards consideration of a monetary award,* such intentional dissipation is no more than a fraud on marital rights, and the chancellor should consider the dissipated property as extant marital property ... to be valued with the other existing marital property. This principle would apply even where the dissipated property cannot be recovered because

it is in the hands of a purchaser who took in good faith, without notice and for value."

58 Md.App. at 399, 473 A.2d 499 (emphasis supplied).

In *Karmand v. Karmand,* 145 Md.App. 317, 345, 802 A.2d 1106 (2002), Judge Deborah Eyler provided a helpful summary of the doctrine of dissipation.

First, *dissipation of marital property can be found "where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage* at a time where the marriage is undergoing an irreconcilable breakdown." . . .

Second, the doctrine of dissipation permits the court to include, as extant marital property, marital property that was transferred, spent, or disposed of in some fashion by one of the spouses, under the circumstances described above. *See Jeffcoat v. Jeffcoat, supra.* Marital property found to have been dissipated is valued as of the time of dissipation. *Hollander v. Hollander,* 89 Md.App. 156, 170, 597 A.2d 1012 (1991). Thus, in this case, it was irrelevant that the marital funds first deposited in the Sequoia account in August 19999 no longer existed at the time of trial. Having properly found that those funds were dissipated by the appellant, the trial court was entitled to treat the funds as if they still were in existence. Indeed, that is the very purpose of the doctrine of dissipation.

(Emphasis supplied).

■ The Wife does not seriously contest the legitimacy of the combined mortgage debt (first and second mortgages) of $220,000 as of the time of the parties' separation in November of 2003. Her allegation of dissipation goes primarily to the home equity lines of credit, which she claims escalated the $220,000 of debt at the time of separation to a debt of $313,677 at the time of trial.

The basic flaw in the Wife's argument on this contention is her erroneous allocation to the Husband of the burden of proving that the various post-separation loans taken against the Golden Fleece property were for a proper family-related

purpose. Her contention depends upon the doctrine of dissipation, and that doctrine places squarely on her the burden of proving an improper purpose to the loans. If neither Husband nor Wife had offered a single word of testimony on this issue, it is the Husband who would have won the nothing-to-nothing tie.

The Husband, however, offered abundant testimony to show a legitimate family-expense related purpose to explain expenditure after expenditure after expenditure. It is unnecessary here to engage in a tedious summation of the Husband's extensive testimony on this issue. Judge Silkworth's Memorandum Opinion contains not only an excellent summary, but it sets out the substantial evidentiary basis for Judge Silkworth's non-clearly-erroneous conclusion.

> Mr. Heger testified that *the lines of credit were taken to pay monthly bills including credit cards, car loans, home maintenance, and replace furniture Ms. Heger had taken after the separation.* The testimony of *both parties* established that they *had a history of refinancing the home and using lines of credit during the marriage and prior to their separation to pay similar expenses.* For example, *the first time a line of credit was taken, it was to pay for the Williamsburg timeshare. Other refinancing was done to apply for cars the couple bought.* According to Mr. Heger, *refinancing became an every other year pattern.* Based upon the testimony of both parties, *the Court does not find that additional liens against the house were made "for the principal purpose of reducing the funds available for equitable distribution." Jeffcoat v. Jeffcoat,* 102 Md.App. 301, 311 [649 A.2d 1137] (1994) (defining dissipation of marital assets). Rather, the current liens against the property were in keeping with the parties' tendency to use the equity in the home to get cash immediately. *Ms. Heger failed to establish that the liens,* such as the most recent line of credit taken in 2006, *were taken to dispose of equity for uses other than family purposes and with the intention of reducing the amount of property available for equitable distribution. Karmand v. Karmand,* 145 Md.App. 317, 343 [802

A.2d 1106] (2001[2002]). In fact, Ms. Heger admitted that she knew Mr. Heger was going to refinance the home again. However, her only testimony was that she did not go with him to the refinance office. She never stated that she objected to Mr. Heger's actions or felt, at the time, that he was stealing away the parties' equity. *Mr. Heger's testimony was credible that the money from the most recent refinancing paid off the family camper and debts to Sears.* Therefore, even if the refinancing unfairly decreased the equity of the home, the funds were used to increase the value of other marital assets."

(Emphasis supplied).

## Pension Survival Benefits

In the "Questions Presented" introduction to the Wife's appellate brief, the present contention is framed in the following words:

> Did the Court err in denying the Appellant's request to be named beneficiary of the Appellee's survivor benefit?

From the single unilluminating page of "argument" offered in support of the contention, we cannot even be sure precisely what the appellant is talking about, and we sense that Judge Silkworth was largely in the same quandary. That the appellant did not cite any law to Judge Silkworth on the subject and does not cite any law on the subject to us is truly secondary, because the appellant did not and does not in the first instance even explain what pension provisions were in issue.

Late in the trial, the appellant moved to have Judge Silkworth order that the Husband should name the Wife as the beneficiary of his pension survival benefits. The Wife, however, offered no evidence that the Husband's pension even provides such benefits, let alone evidence of her entitlement to them. The Husband took the stand and testified that "his disability pension plan does not have a joint and survivor benefit election." He stated that the County's forms were generic and, if he were to die, his spouse [presumably his then spouse and not his ex-spouse] "would receive 100% of whatev-

er he was receiving until she remarried." There was no other evidence offered with respect to the pension or with respect to any survivorship provisions.

As to the current disposition of the Husband's disability pension, Judge Silkworth used the so-called *Bangs* formula (from *Bangs v. Bangs*, 59 Md.App. 350, 475 A.2d 1214 (1984)), and, literally applying the words of *Bangs* at 59 Md.App. at 356, 475 A.2d 1214 to establish the critical marital/non-marital fraction, determined that 64% of the disability pension was marital and that, therefore, the remaining 36% of the pension was non-marital. He accordingly awarded the Wife 50% of the marital portion of the pension, which award amounted to 32% of the pension. (One-half of 64% is 32%). We will have much more to say about what the correct marital/non-marital fraction should have been when addressing one of the later contentions.

■ On the distinct question of ordering that the Wife be designated as the recipient of a survivor's benefit, however, the Wife failed to provide Judge Silkworth with enough information to persuade him to take such an action. In his Memorandum Opinion, Judge Silkworth explained:

> In addition to the issue of monthly payments, *the question of a survivor's benefit was raised by Ms. Heger's attorney.* The court has authority to require one spouse to designate the other for survivor's benefits under a survivor's benefit plan. *Matthews v. Matthews*, 336 Md. 241 [647 A.2d 812] (1994). The purpose of this authority is to continue the protection of spouse's interest in the marital portion of the pension. *Pleasant v. Pleasant*, 97 Md.App. 711 [632 A.2d 202] (1993).
>
> *Mr. Heger testified that his disability pension plan does not have a joint and survivor annuity benefit election. He stated that the County's forms were generic and, if he were to die, his spouse would receive 100% of whatever he was receiving until she remarried.* In response to the Court's question, Mr. Heger did not know if his divorce would change the circumstances so that Ms. Heger would no

longer receive that money. Mr. Heger further testified that there was no option in his pension regarding annuity. On direct examination by her attorney, *Ms. Heger did not testify that the parties had an agreement that she would remain the joint and survivor beneficiary.*

*Based upon the lack of information provided to the Court and the fact that Ms. Heger will be receiving an equitable share of Mr. Heger's pension, the request for a survivor benefit annuity election is denied.*

(Emphasis supplied).

We see no abuse of discretion in Judge Silkworth's denial of the motion.

### Income Tax Dependency Exemptions

This was a four-day trial that produced a record extract of approximately 1000 pages. Judge Silkworth resolved a dozen hotly contested issues and explained those resolutions in a meticulously thorough 37–page Memorandum Opinion. We are not about to reverse the trial court on the basis of some fleeting allusion to something that never became an unequivocally raised and articulately argued issue calling for the court's unquestioned consideration and decision. We do not favor stealth contentions.

The Wife, however, urges us to do just that as she contends that Judge Silkworth erroneously failed to grant her the income tax dependency exemptions for the two children. She does not even tell us whether she is referring to the federal income tax, the Maryland income tax, or both, as her total argument consists of the following:

As part of the Court's child support finding, the Appellant requested that she be granted the dependency exemptions, but the Court's Judgment was silent on this point. It is respectfully contended, under the particular facts of this case, that the Court erred in not granting this request of the Appellant.

The contention, which cites no law, runs in its entirety to less than a page. The Wife ignores the fact that the United

States Internal Revenue Code (2007), § 152(c)(4)(B)(i) expressly provides that the exemption for a child shall be claimed by "the parent with whom the child resided for the longest period of time during the taxable year." That would unquestionably be the Husband in this case.

██ A court order such as one which the Wife may inferentially have suggested in this case, if indeed she did that much, would be, moreover, completely ineffectual. As this Court pointed out in *Wassif v. Wassif,* 77 Md.App. 750, 759, 551 A.2d 935 (1989), "a court order, standing alone, is ineffective to transfer a dependency exemption to a non-custodial parent." Only a signed waiver by the custodial parent could accomplish what the Wife wishes to accomplish. As we explained in *Wassif,* 77 Md.App. at 759, 551 A.2d 935:

> By virtue of the Deficit Reduction Act of 1984 (Pub.L. No. 98–369, 98 Stat. 494), this law was amended to provide that *the custodial parent is now always entitled to the exemption unless he or she executes a signed waiver disclaiming the child as an exemption* for a given year. IRC § 152(e)(2)(A) (Supp.II, 1984). Thus, under the new law, a court order, standing alone, is ineffective to transfer a dependence exemption to a non-custodial parent.

(Emphasis supplied).

Although, as *Wassif* further pointed out, the court has the power to order the custodial parent, in compelling circumstances, to execute such a waiver, there is no indication that the Wife in this case expressly requested that such a waiver be ordered or that the Wife made a clear and unequivocal argument to Judge Silkworth in that regard. No such issue was truly before the court.

### Attorney's Fees

██ The Wife contends that her request for attorney's fees was erroneously denied. Maryland Code, Family Law Article, § 7–107(b) provides:

> (b) At any point in a proceeding under this title, the court may order either party to pay to the other party an amount

for the reasonable and necessary expense of prosecuting or defending this proceeding.

Subsection (c) then provides that, when considering such an order to pay:

(c) Before ordering the payment, the court shall consider:

(1) the financial resources and financial needs of both parties; and

(2) whether there was substantial justification for prosecuting or defending the proceeding.

In this case, Judge Silkworth engaged in a thorough consideration of "the financial resources and financial needs of both parties," as he considered separately the questions of 1) the marital award, 2) alimony, and 3) the amount of child support. In considering the alimony question, Judge Silkworth found with respect to the Wife:

Ms. Heger testified that she has established a home in Indiana and is working as a cosmetologist. There is no indication that Ms. Heger is not already wholly self-supporting. . . .

. . . .

. . . Ms. Heger has already demonstrated that she was able to find suitable employment since the parties separated. During the marriage she gained the necessary education, skills and experience to become a cosmetologist.

Judge Silkworth found the following with respect to the Husband:

Mr. Heger testified that he lives off of his pension and had no other income. It is unlikely that he would be able to meet his needs as well as support Ms. Heger. Given that Ms. Heger is able to work as a cosmetologist, which will contribute significantly to creating the lifestyle she had in Maryland, this factor would weigh against awarding alimony.

The marital award, moreover, placed the parties on an essentially equal status financially.

The marital award has equitably divided the parties' assets. On balance, after this property division, the parties are fairly equal in terms of benefiting from the assets accumulated during the marriage. The evidence presented did not establish that Mr. Heger's non-marital assets enhanced his financial position to a degree that made his circumstances unconscionably disproportionate. Mr. Heger has the right to receive retirement benefits and Ms. Heger's marital interest in that pension has been recognized. If anything, *Mr. Heger's financial needs will be greater than Ms. Heger's because he will be the primary care-giver of the parties' two boys.*

(Emphasis supplied).

In making his determination with respect to child support, Judge Silkworth looked closely at the Husband's income.

*Mr. Heger testified that his sole source of income is his disability pension.* According to the Police Service Retirement Plan entered in evidence as Defendant's Exhibit Z, Mr. Heger's annual benefit was $44,148.96 per year, which was $3,679.08 per month. Also in evidence are Mr. Heger's 2005 income tax return showing his pension income as $45,127.00, none of it taxable, and Mr. Heger's financial statement signed December 6, 2006, stating that his monthly income is $3,915.00. This equates to $46,980.00.

Based upon the testimony and exhibits from trial, *the Court has established Mr. Heger's income to be $3,915.00 per month* based upon the evidence of his most recent income. Subtracted from that figure is $1,253.00, which is the amount of Mr. Heger's pension income that is payable to Ms. Heger pursuant to this Court's order. *This brings Mr. Heger's total income to $2,662.00.*

(Emphasis supplied).

Judge Silkworth then looked closely at the Wife's income.

Ms. Heger testified that her income ranges from $33,000.00 to $40,000.00 depending on her tips. In an average year, she testified that she made approximately $3,000.00 in tip income. For 2006, she testified that her

income before tips was $28,000.00 and that she expected to make the same amount of money in Indiana for 2007. The Court notes that Mr. Heger's counsel established that Ms. Heger did not provide figures to the IRS on her income tax returns that were consistent with her testimony.

Based upon the entirety of the evidence, *the Court has established Ms. Heger's income to be $3,040.00 per month. Added to this figure is $1,253.00, which Ms. Heger receives from Mr. Heger's pension. This brings her total monthly income for child support purposes to $4,293.00.*

(Emphasis supplied).

When presented with the Wife's request for attorney's fees, Judge Silkworth ruled:

The Family Law Article authorizes a court to award reasonable and necessary expenses, consisting of suit money, counsel fees and costs, at any point in a divorce proceeding. *The court must consider the financial resources and financial needs of both parties,* and whether there was substantial justification for prosecuting or defending the proceeding. Md.Code Ann., Fam. Law § 7–107, § 8–214, § 11–110, § 12–103.

*Because this Court has already discussed the financial needs and resources of both parties in the context of its determination of alimony and a monetary award, these facts need not be repeated. As with alimony, the Court does not find it necessary to award Ms. Heger additional money for attorney's fees after the equitable division of property is taken into consideration, as well as the financial needs and resources of each party.*

(Emphasis supplied).

We see no abuse of discretion in that ruling. *Lopez v. Lopez,* 206 Md. 509, 520–21, 112 A.2d 466 (1955); *Gravenstine v. Gravenstine,* 58 Md.App. 158, 182, 472 A.2d 1001 (1984).

### Correcting Typographical and Arithmetic Mistakes

In his original Judgment of Divorce Absolute filed on June 15, 2007, Judge Silkworth made an unquestioned arithmetic

error in inserting the correct numbers under the so-called *Bangs* formula before applying it to the Husband's disability pension. Also with respect to the disability pension, someone, judge or reporter, obviously misspoke or mistyped the word "nonmarital" when what was clearly intended was the word "marital." On July 31, 2007, the Husband filed a Motion to Revise the Judgment pursuant to Maryland Rule 2–535.

In the original Memorandum Opinion Judge Silkworth is recorded as saying, "[T]he Court has determined, based upon the marital award factors, that Ms. Heger shall receive one-half of the **non-marital** portion of Mr. Heger's pension." This was corrected so as to read "one-half of the **marital** portion." The propriety of making that correction speaks for itself. That was clearly a mere "clerical mistake," which, under Rule 2–535(d), "may be corrected by the court at any time on its own initiative, or on motion of any party." Rule 2–535(d) provides:

> (d) **Clerical mistakes.** *Clerical mistakes* in judgments, orders, or other parts of the record *may be corrected by the court at any time on its own initiative, or on motion of any party* after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed by the appellate court, and thereafter with leave of the appellate court.

(Emphasis supplied).

### The *Bangs* Formula, Implicit and Explicit

In applying the *Bangs* formula to a pension, it is initially necessary to take the total working life of an individual over the course of which a pension accrued. That is how we determine the total monetary value of the pension itself. We must then determine what fraction of that total working life occurred during the marriage (the marital contribution) and what fraction of the contribution was non-marital. The denominator of that fraction in this case is the total working life of the Husband as an Anne Arundel County policeman, to wit, from October 21, 1977, through October 16, 2003, when he took his medical retirement. That figure came to 312 months

of employment (or 26 years). The function of the arithmetic procedure is to determine how many of those 312 months were marital and how many were not. It is thus that we are able to determine what percentage or fractional share of the asset being evaluated was marital. Additional months of life (and of marriage) after the pension stops accruing are not a part of the denominator, because they have nothing to do with the value of the asset being assessed.

In determining the marital contribution and the non-marital contribution toward the growth of a pension, the use of the so-called *Bangs* formula calls for cautious application. The use of the arithmetic process itself is easy and it would probably have been better off if it had never been given its shorthand title. It was only when we encumbered a simple arithmetic exercise with a grandiose label such as the *"Bangs* formula" and then relied upon the opinion in *Bangs v. Bangs,* 59 Md.App. at 356, 475 A.2d 1214, to describe verbally the operation of the arithmetic exercise that the chance of inadvertent error crept in. To avoid error, our reliance would better be directly upon the underlying arithmetic principle itself and not upon *Bangs's* second-generation description of it. The potential problem is that *Bangs* itself gave us only a partial statement of the principle it was attempting to describe. *Bangs,* 59 Md.App. at 356, 475 A.2d 1214, explicitly described its numerator as "Years and months of marriage." The *Bangs* opinion was primarily concerned with other issues, not here pertinent, and its entire treatment of the arithmetic process that was destined to bear its name consisted of two sentences in a single purely narrative paragraph.

> *Appellee was granted* a monetary award of $32,900 plus a future sum or sums of money equal to *a fractional share of appellant's retirement pension* if, as and when he receives it. The fractional share payable to appellee out of each pension payment appellant receives is: one-half of *a fraction of which the number of years and months of the marriage* (12 years, 7 months) *is the numerator and the total number of years and months of employment credited toward retirement is the denominator.*

$$\frac{1}{2} \times \frac{\text{Twelve years and seven months of marriage}}{\text{total years of employment}}$$

59 Md.App. at 356, 475 A.2d 1214 (emphasis supplied). That statement of the numerator was not wrong. It was, however, only a partial statement or a half-truth, and therein lies the danger.

The additional meaning that is incontrovertably implicit in the numerator, as *Bangs* is applied to this case, is "**WORKING** years and months of marriage" or "Years and months of marriage **IN WHICH THE PENSION CONTINUES TO ACCRUE AND GROW.**" The only reason that the implicit qualifier was not made explicit in *Bangs* is that the pension in that case continued to accrue and grow in value through the length of the marriage and even after the marriage terminated. There were in that particular numerator no "years or months of marriage" left over after the time when the denominator had ceased to grow. The *Bangs* opinion was adequate to resolve the limited issue before the Court in that case, and it did not presume to go beyond into a broader exposition of the law. The value of the numerator was not in issue in *Bangs* and no depth of analysis was called for. In this case, unlike in Bangs, the accrual of the pension terminated before the marriage terminated. *Bangs* simply did not address what is now before us.

### What Is a Fraction?

Although *Bangs* may not have addressed what is now before us, the underlying mathematical principle does address it. A numerator and a denominator in combination constitute a fraction. The question, critical in a case such as this, is "a fraction of what?" It is the denominator that sets out that "what," the quiddity, of the fraction. The fundamental mathematical principle is that a numerator is, by definition, a part or a share of its denominator. A numerator, at least for *Bangs v. Bangs* purposes, cannot be greater than its denominator. Both the numerator and the denominator, moreover, must compute similar units of measurement, lest the so-called frac-

tion be meaningless gibberish. Six apples are three-quarters of eight apples, but not three quarters of something else. Fifteen acres are 25% of 60 acres but are not 25% of something else.

In this case, the units in the denominator were unquestionably the working months in which the pension accrued. The only question for the numerator then was that of how many of **THOSE WORKING MONTHS** were marital. Nothing else would yield a meaningful fraction or percentage. The unit expressed in the denominator is necessarily implicit in the numerator. It is axiomatic that a numerator is meaningless except in relation to its denominator.

What are obviously being called for are determinations of the respective fractional contributions toward the growth of a valuable asset that were made by 1) the marital months and years as compared with 2) the non-marital months and years. In *Gravenstine v. Gravenstine,* 58 Md.App. 158, 169, 472 A.2d 1001 (1984), Judge Alpert explained:

> It is uncontroverted that *payments made toward the pension by appellant prior to the marriage were nonmarital contributions and thus constitute nonmarital property.* On the other hand, *that portion of appellant's pension that accrued after the date of marriage having been paid for by marital contributions was "acquired during the marriage" and thus was clearly marital property.* Harper makes clear that the chancellor must determine the total nonmarital and marital investment as only the marital property is subject to equitable distribution.

(Emphasis supplied).

What is being measured, of course, is how much of the value of a pension accrued during the marriage. We are unconcerned with other times, married or unmarried, in which there was no accrual of value. As Judge Bloom stated for this Court in *Imagnu v. Wodajo,* 85 Md.App. 208, 212, 582 A.2d 590 (1990):

> There is, of course, no dispute as to whether *pensions or retirement benefits that accrue during a marriage* consti-

tute marital property under Md.Code (1984), Fam. Law Art. § 8–201(e). That they are is well established. *Deering v. Deering*, 292 Md. 115, 437 A.2d 883 (1981); *Gravenstine v. Gravenstine*, 58 Md.App. 158, 168, 472 A.2d 1001 (1984). (Emphasis supplied).

The marital property calling first for evaluation and then for division is, by definition, property of some measurable value. As expressed by Judge Digges in *Deering v. Deering*, 292 Md. 115, 125, 437 A.2d 883 (1981):

> "[M]arital property" is defined as *"all property*, however titled, acquired by either or both spouses during the marriage." (emphasis supplied). *The term property*, "when considered in a broad sense, is a term of wide and rather comprehensive signification.... It has been stated that the term *embraces everything which has exchangeable value or goes to make up a man's wealth—every interest or estate which the law regards of sufficient value for judicial recognition."*

(Emphasis supplied).

The bottom line is that we should forego talking about "the *Bangs* formula" unless the statement of the formula is expanded into a fuller and more accurate statement of precisely what the critical fraction is supposed to measure. We have taken perhaps an unnecessarily circuitous route to explain what should be an obvious truth. We have not, however, been hammering out some novel or innovative legal theory. We have simply been attempting to put into plain words a transcendent and axiomatic arithmetic principle that anyone should be capable of figuring out for himself.

### A Simple Computational Error

 The mistake in this case, therefore, was purely a computational error. As his Memorandum Opinion made pellucidly clear, Judge Silkworth understood that after assessing the dollar value of the pension, it was necessary for him to compute the percentage of that pension, to wit, the marital share of it, that had accrued during the marital years. His

articulation of what he was required to do and of what he intended to do was letter perfect.

> *Mr. Heger worked* for the Police Department from October 21, 1977 *until October 16, 2003.* This equates to approximately 26 years of employment. The parties did not separate until after his termination [from] the police department. The date of their marriage was November 16, 1990. Therefore, *the number of years and months during which the parties were married and Mr. Heger was working for the police department was 12 years and 11 months.*

(Emphasis supplied).

Judge Silkworth there expressly stated what the units were that were being measured: "the number of years and months during which [1] the parties were **MARRIED** and [2] Mr. Heger was **WORKING** for the police department." At that point, the only function of the numerator was to measure how many of **THOSE UNITS,** to wit, the months that were both **MARRIED AND WORKING** months, were marital.

Twelve years and eleven months yields a numerator of 155 working months. The obvious number of months in the denominator, to wit, the working months during which the pension acquired its value, was 26 years times 12 months for a total of 312 months. When the correct numerator of 155 is then divided by that correct denominator of 312, the correct fractional portion or percentage of the pension that was marital is 49.7%, which Judge Silkworth rounded off to 50%. He quite properly awarded the Wife 50% of that corrected marital share, which amounted to 25% of the pension itself (50% of 50%). It was just a matter of inserting into a self-evident formula the right numbers.

That numerator of 155 was not, of course, something subject to legal interpretation. The determination of that numerator was not, moreover, something within the discretion of the trial judge. It was a hard historic and mathematical fact not subject to dispute. How many of the working months in which the pension accrued occurred during the course of the marriage? That figure is what it is. Judge Silkworth indicated precisely what he intended for that numerator to be—and

why he intended it. But somehow, "between the motion and the act falls the shadow"[1] of *Bangs*. A purely inadvertent slip occurred as Judge Silkworth paid ceremonial deference to *Bangs*.

> *When an employee-spouse has earned a portion of the pension outside of the marriage and a portion of the pension during the marriage, the "Bangs" formula is often used. The Bangs formula was established in Bangs v. Bangs, where the court determined what percentage share the payee spouse would receive* and multiplied this percent by a fraction.

(Emphasis supplied).

In looking at page 356 of 59 Md.App., 475 A.2d 1214, the judge mechanistically used the uncritical and partial language of *Bangs* without alerting to the more nuanced limitation implicit within it. The resulting mistake was to count as part of the numerator not only those monthly units that were both 1) married months and 2) working months (thus far, quite correct), but also to count totally extraneous months that were "married months" but were not also "working months." The use of the wrong fraction yielded an inflated marital share of the pension.[2] When this computational mistake was brought to Judge Silkworth's attention, it was immediately and quite properly corrected. His final order was amended to conform to what he had intended to order all along. Relying unduly on *Bangs*, he simply misspoke in articulating the numerator.

### Maryland Rule 2–535

█ We hesitate to raise an issue that was not raised before Judge Silkworth and that was mentioned only in the

---

**1.** T.S. Eliot, "The Hollow Men."

**2.** Hypothecize a now divorced couple who were married for 100 months, during which time the husband accrued a pension for the first 10 months of that period before retiring or quitting his job. A simplistic or mechanistic application of what *Bangs* says, while ignoring what *Bangs* self-evidently means, would yield a marital share of the pension ten times or 1000% as great as the pension itself. It would be facially ridiculous.

most allusive of fashions before us, but the issue may merit some comment. Judge Silkworth's correction of what was a clear and facial mistake in putting the proper numbers into his measurement of the marital fraction of the disability pension was made in response to the Husband's motion to revise the judgment pursuant to Maryland Rule 2–535. Subsection (a) of that rule provides:

> (a) Generally.—*On motion* of any party *filed within 30 days after entry of judgment,* the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2–534.

(Emphasis supplied). Subsection (b) goes on to provide an exception to the 30–day time limit.

> (b) Fraud, Mistake, Irregularity.—*On motion* of any party *filed at any time, the court may exercise revisory power* and control over the judgment *in case of* fraud, *mistake,* or irregularity.

(Emphasis supplied). Subsection (d) provides yet another (and perhaps overlapping) exception to the 30–day time limit.

> (d) Clerical Mistakes. *Clerical mistakes in* judgments, *orders,* or other parts of the record *may be corrected by the court at any time on its own initiative, or on motion* of any party after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed by the appellate court, and thereafter with leave of the appellate court.

(Emphasis supplied).

The divorce decree in this case was entered on June 15, 2007. The first post-decree motion was filed by the Wife on June 25, 2007, pursuant to Rules 2–534 and 2–535. It was entitled "Motion to Alter or Amend Judgment" and "Motion for Exercise of Revisory Power." The Husband filed his response to the motion on July 10, 2007. That motion was not finally denied until December 3, 2007. The pertinent effect for present purposes of the Wife's timely filing of her motion pursuant to Rules 2–534 and 2–535 was that so long as that

motion was pending, the divorce decree entered on June 15, 2007, did not attain finality as an enrolled judgment. The Husband's subsequent motion now under review, therefore, constituted no threat to the law's repose. In *Popham v. State Farm,* 333 Md. 136, 144, 634 A.2d 28 (1993), Judge (now Chief Judge) Bell explained:

> [T]he finality of a judgment, otherwise final, is lost when a party files a motion pursuant to Maryland Rule 2–533, 2–534, or 2–535, within ten days of its entry.

In *Allstate Insurance Co. v. Atwood,* 319 Md. 247, 264, 572 A.2d 154 (1990), Judge Eldridge similarly explained:

> After the jury's verdict or court's decision in the tort case, and no later than ten days after the entry of judgment in the tort suit, the insurer shall file ... a motion under Maryland Rules 2–532, 2–533, or 2–534, whichever is appropriate.... *The motion under Rules 2–532, 2–533, or 2–534 will render the tort judgment nonfinal.*

(Emphasis supplied). See also *Medical Mutual v. Davis,* 365 Md. 477, 484, 781 A.2d 781 (2001); *Alitalia v. Tornillo,* 320 Md. 192, 200, 577 A.2d 34 (1990); *B. & K. Rentals v. Universal Leaf,* 319 Md. 127, 132, 571 A.2d 1213 (1990); *Yarema v. Exxon Corp.,* 305 Md. 219, 241 n. 19, 503 A.2d 239 (1986); *Unnamed Attorney v. Attorney Grievance Commission,* 303 Md. 473, 486, 494 A.2d 940 (1985); *Stephenson v. Goins,* 99 Md.App. 220, 225, 636 A.2d 481 (1994); *Sieck v. Sieck,* 66 Md.App. 37, 42–44, 502 A.2d 528 (1986).

While the Wife's motion was still pending, the Husband filed his own Rule 2–535 Motion to Revise Judgment based on the erroneous marital fraction of the disability pension on July 31, 2007. That filing came, to be sure, 46 days after the divorce decree had been entered. Had the issue been timely raised and had the Wife's open motion not prevented the divorce decree from becoming enrolled, the Husband's filing might presumptively have been barred under 2–535(a), unless he qualified for an exemption from the filing deadline under either subsection (b) or subsection (d) or both. The Wife, however, raised no issue about the timing of the Husband's

motion. She accepted it and the proceedings moved forward accordingly. On August 15, 2007, she filed her response and made no reference to a filing deadline. Her complete response was as follows:

### RESPONSE TO MOTION TO REVISE JUDGMENT

The Defendant, Stefanie Heger, in response to the Plaintiff's Motion to Revise Judgment, respectfully says:

1. That she admits the allegations set forth in paragraphs 1, 2, and 3 of the said Motion.

2. That she denies the allegations set forth in paragraph 4 of the said Motion, except that she admits that the reference should have been to one-half of the marital portion of the pension.

3. That she denies the allegations set forth in paragraphs 5, 6, and 7 of the Motion.

WHEREFORE, the Defendant respectfully requests:

A. That the relief requested in the Plaintiff's Motion to Revise Judgment be denied;

B. That the Defendant be awarded her attorney's fees and costs in connection with this proceeding;

C. And for such other and further relief as the nature of her cause may require.

Judge Silkworth's Amended Judgment of Absolute Divorce, in response to the Husband's motion, was ordered on August 29, 2007, and filed on August 31, 2007. In her appellate brief, the Wife devotes three pages of her discussion of this contention to the merits of why the Amended Judgment of August 31, 2007, should not have been granted. In the middle of the second paragraph, however, a single passing sentence alludes to the timeliness of the filing of the Rule 2–535 motion:

Also in this case, the Appellee, the party who was granted relief in the Amended Judgment of Absolute divorce, did not make a timely request for relief under either Maryland Rule 2–534 or Rule 2–535.

▮▮▮▮▮▮▮▮▮

The Wife has simply not preserved this issue for appellate review.

▮▮▮▮ Even assuming, *arguendo*, that the merits of the Husband's entitlement to file his Motion to Revise pursuant to Rule 2–535 were properly before us, the possible literal violation of 2–535(a)'s 30–day limit needs to be put in perspective. The fundamental purpose of the filing deadline is to safeguard the finality and repose of enrolled judgments. In view of the fact that the Wife's motion under both 2–534 and 2–535 had denied the divorce decree finality, the Husband's 2–535 motion, albeit late under 2–535(a), constituted not an attack on an enrolled judgment, the thing 2–535(a) was designed to discourage, but only an effort to make an obvious correction to an unenrolled judgment. The "precise rubric" of the filing deadline may not have been literally satisfied, but the undergirding purpose of the rule was not in any way compromised. The sin, if any, was a venial one.

The law has consistently treated an attack on an enrolled judgment and an attack on an unenrolled judgment in dramatically different ways. Judge Wilner best expressed it for this Court in *Weaver v. Realty Growth Investors*, 38 Md.App. 78, 82, 379 A.2d 193 (1977):

> *The revisory power* granted by Rule 625 [the predecessor to Rule 2–535] *over unenrolled judgments is to be liberally exercised,* "lest technicality triumph over justice." *Hamilton v. Hamilton*, 242 Md. 240 [218 A.2d 684] (1966).

(Emphasis supplied).

In *Haskell v. Carey*, 294 Md. 550, 558, 451 A.2d 658 (1982), the Court of Appeals stressed the difference between revising an enrolled judgment and an unenrolled judgment.

> *The purpose of authorizing a trial court to exercise broad discretion to revise unenrolled judgments is to insure that technicality does not triumph over justice.* The purpose of limiting a trial court's discretion to revise an enrolled judg-

ment is to promote finality of judgment and thus to insure that litigation comes to an end.

(Emphasis supplied).

*Hamilton v. Hamilton,* 242 Md. 240, 243, 218 A.2d 684 (1966), spoke to the same effect.

"While there is a strong public policy in favor of sustaining the finality of divorce decrees, *this policy would not operate in regard to an unenrolled decree* before parties could have changed their position and relied on it to their detriment."

(Emphasis supplied). The correction in this case, of course, was made to an unenrolled judgment, not an enrolled one.

Even if, however, we were further to assume, purely *arguendo,* 1) that the issue had been adequately preserved and 2) that the filing of the motion was too late to qualify under Rule 2–535(a), there would still be the issue of whether the motion nonetheless qualified under one or both of the exceptions to the filing deadline under subsection (b) or subsection (d). We would not hesitate to hold that it would qualify either under subsection (b), dealing with mistake generally, or subsection (d), dealing with clerical mistakes specifically, or both. Without any input from counsel for either side of this issue, it would be foolhardy for us to delve into the possible subtle differences, if any, between the "mistake" quadrant of subsection (b) and "clerical mistake" under subsection (d). The Source Note to Rule 2–535 does point out, however, that whereas subsections (a) and (b) derive from former Rule 625, subsection (d) is derived from 1) Federal Rule of Civil Procedure 60(a) and 2) from former Maryland Rule 681, dealing with Equity and providing:

Clerical mistakes in a decree or decretal order, or errors arising from any accidental slip or omission, may at any time be corrected by order of court upon petition, without a rehearing.

The other source of Rule 2–535(d) is revealing as to the contemplated scope of the correction of "clerical mistakes." Federal Rule of Civil Procedure 60(a) provides:

(a) Clerical Mistakes. *Clerical mistakes in judgments, order or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party* and after such notice, if any, as the court orders. During a pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

(Emphasis supplied). See *Sieck v. Sieck,* 66 Md.App. 37, 43, 502 A.2d 528 (1986). Subsection (d) came out of equity practice. Although there is no caselaw applying subsection (d), it seemed to come out of a looser and more flexible procedural milieu.

Because, moreover, this case—involving divorce, alimony, the distribution of marital property, and child support—was a quintessential equity matter, we take additional solace in Paul V. Niemeyer and Linda M. Schuett, *Maryland Rules Commentary* (2d ed., 1992), Rule 2–535, at 419:

*Doctrine of continuing jurisdiction.*

*In a matter over which the court has continuing jurisdiction, such as,* for example, *traditional equity cases involving alimony, custody, child support,* injunctions, *and continuing equity supervision, the limitations of Rule 2–535 do not apply.* See, e.g., Code, Courts Art., § 3–602(a), which specifically grants continuing jurisdiction in certain domestic relations matters. ...

Under the doctrine of continuing jurisdiction, if the court obtained original personal jurisdiction over a party, the jurisdiction continues throughout all subsequent proceedings that arise out of the original cause of action, so long as reasonable notice and opportunity for hearing are given the party at each subsequent step.

(Emphasis supplied). See also *Bell v. Shifflett,* 249 Md. 104, 107, 238 A.2d 533 (1968); *Bailey v. Bailey,* 181 Md. 385, 388, 30 A.2d 249 (1943).

Even if, *arguendo*, this question had been properly preserved, we, for a variety of reasons (some overlapping and some intertwined), would not be persuaded that Judge Silkworth had abused his discretion in making a self-evidently needed correction in his decree. We applaud the correction.

### A Necessary Remand

The necessary correction in the mistaken computation of the marital share of the pension, however, may have potential ripple effects that cannot be ignored. As part of the Judgment of Divorce of June 12, 2007, Judge Silkworth ordered the Husband to pay to the Wife "as an adjustment of the equities, a monetary award in the amount of $28,403." The Wife, in turn, was ordered to pay child support in the amount of $836 per month. In arriving at both of those figures, the court took into consideration the respective incomes of both Husband and Wife. Their respective shares of the Husband's pension were significant factors in computing those respective incomes.

When, therefore, the correction of the *Bangs v. Bangs* numerator reduced the Wife's share of the pension from 32% to 25% and concomitantly raised the Husband's share from 68% to 75%, there was an obvious shift in the predicate data on which both the marital award figure and the child support figure had been based. It is, therefore, necessary to remand the case so that the court may reconsider the appropriateness of those figures in light of the corrected income date.

**CASE REMANDED SO THAT THE AMOUNT OF THE MARITAL AWARD AND THE AMOUNT OF CHILD SUPPORT MAY BE RECONSIDERED; JUDGMENT AFFIRMED IN ALL OTHER REGARDS; COSTS TO BE PAID 75% BY THE APPELLANT AND 25% BY THE APPELLEE.**