*Sims v. Sims*, No. 1787, September Term, 2024.  Opinion by Nazarian, J.

**DIVORCE – AWARDING MONETARY AWARD – THE THREE-STEP PROCESS**

In order to determine appropriateness of a monetary award, a trial judge must determine what property is marital property and assess the value of each item; after totaling the value of all marital property, the court then should determine the value of marital property titled as to each of the parties and the value of marital property titled jointly; the court also must determine the value of nonmarital property owned by each of the parties and make equitable adjustments if necessary. *See* Md. Code (1999, 2019 Repl. Vol.), §§ 8-203–8-205 of the Family Law Article ("FL").

**DIVORCE – MONETARY AWARD – SEPARATE OR MARITAL PROPERTY**

When one party, wholly through their own efforts and without any direct or indirect contribution by the other, acquires specific item of marital property after parties have separated and after marital family has, as practical matter, ceased to exist, a monetary award representing equal division of that particular property would not ordinarily be consonant with history and purpose of equitable distribution statute. *See* FL § 8-203(a).

**DIVORCE – EXTANT MARITAL PROPERTY – DISSIPATION**

In divorce proceedings, dissipation may be found where one spouse uses marital property for their own benefit for a purpose unrelated to the marriage at a time where the marriage is undergoing an irreconcilable breakdown.

**DIVORCE – EXTANT MARITAL PROPERTY – DISSIPATION**

Burden of persuasion and initial burden of production in proving dissipation of marital assets lies with the party making the allegation, and that party retains throughout the burden of persuading court that funds had been dissipated, but after party establishes prima facie case of "dissipation," *i.e.*, that funds have been expended for principal purpose of reducing funds available for equitable distribution, the burden shifts to the party who spent money to produce evidence sufficient to show that expenditures were appropriate.

**DIVORCE – ALIMONY – REQUIRED FACTORS**

A formal checklist of each factor for an award of alimony is not mandatory; however, the court must demonstrate consideration of the required factors. FL § 11-106(b).

**DIVORCE – CHILD SUPPORT – INCOME ABOVE THE GUIDELINES**

In an "above guidelines case," considered to be one in which the parties' combined adjusted income exceeds the highest level of income specified in the child support guidelines, the trial court, in exercising its significant discretion, may employ any rational method in balancing the best interests and needs of the child with the parents' financial ability to meet those needs. *See* FL §12-204(e).

**DIVORCE – CHILD SUPPORT – ARREARAGES**

Although retroactive support is allowed, it is by no means mandatory; a trial court has discretion whether to award support retroactively. *See* FL §12-101.

**DIVORCE – INTERRELATED AWARDS**

Factors underlying alimony, child support, monetary awards, and counsel fees are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1787

September Term, 2024

_____

CEDRIC SIMS

v.

REBEKAH SIMS

_____

Nazarian,
Beachley,
Kenney, James A., III
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: June 30, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

After a four-day trial, the Circuit Court for Anne Arundel County granted Rebekah Sims ("Wife") an absolute divorce from her Husband, Cedric Sims ("Husband"), and awarded her a monetary award, rehabilitative alimony, child support and child support arrearages, and attorneys' fees. Husband challenges nearly all the court's financial decisions, and both sides agree that errors in the calculation of the monetary award require us to vacate that award. Given the interrelated nature of the other financial rulings, we must vacate those as well and remand to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

Husband and Wife were married in 1996. The couple have four children, three of whom are emancipated and one of whom is minor. The parties separated in January 2020.

Wife filed her complaint for absolute divorce on November 28, 2022. Husband answered on January 10, 2023, and filed a counter-complaint for absolute divorce on March 1. Wife answered the counter-complaint on March 15, 2023. Wife's grounds for divorce were adultery, desertion, and the parties' twelve-month separation, and she requested indefinite alimony, child support, a dissipation finding, a monetary award, attorneys' fees, and use and possession of the marital home. Husband asked the court to grant the divorce based on their twelve-month separation, order the sale of the marital home, and determine and divide the parties' marital property. He also asked the court to deny Wife alimony but to transfer the entirety of his interest in the marital home, along with the equity in the home, to Wife. He sought his own monetary award as well. The parties filed a joint statement under Maryland Rule 9-207 on March 8, 2024.

The circuit court heard the case over four trial days from March 19 to March 22, 2024. At trial, the court heard testimony from Wife and Husband and Wife's friend, Tracy Mills. After receiving their testimony, the circuit court issued an oral ruling on June 27, 2024, granting Wife an absolute divorce due to adultery, rehabilitative alimony of $2,500 monthly for three years, monthly child support of $6,313 with arrearages dating back to May 1, 2024, and use and possession of the marital home for three years. Under the ruling, Husband would make payments toward the mortgage on the marital home, along with the home's insurance, during the three-year period, and after that would transfer his interest in the property to Wife. The court also ordered him to pay the minor child's tuition expenses.

To determine the monetary award, the court totaled the parties' non-retirement and retirement marital property and assigned each a value. For the non-retirement estate, the court assigned a value of $1,301,525.98. This included assets the court found Husband to have dissipated, which the court valued at $216,866.98. The court valued the parties' retirement estate at $498,431.62. In reaching these conclusions, the court stated that it did not include any assets that the parties acquired after they separated in January 2020. From there, the court distributed the non-retirement marital property, $843,473.38 to Wife and $458,052.60 to Husband. Wife's share included the marital home, which the court valued at $788,359, and deducted from Wife's share of the distribution, amounting to a monetary award of $55,114.38. The court ordered the parties to split their retirement assets equally on an if, as, and when basis. Finally, the court awarded Wife attorneys' fees totaling $9,548.

The court memorialized these findings in its judgment of absolute divorce. The court specified that the child support arrearages totaled $12,626. After crediting Husband for

2

paying $2,000, the court added the remaining $10,626 to the child support obligation by adding $500 to each monthly payment until the arrears were paid in full. The court also ordered that the minor child's tuition payments were Husband's responsibility alone. In addition, for the monetary award, the court specified that the equitable distribution was 65% to Wife and 35% to Husband. The monetary award was $55,114.38 to Wife, paid by Husband at the rate of $4,592.87 monthly.

Husband filed a timely appeal. We include additional facts as appropriate below.

## II. DISCUSSION

The parties present several questions[1] that we have recast into four: (1) whether the

---

[1] Husband lists six Questions Presented in his brief:

1. Did the Trial Court err in determining the amount and duration of rehabilitative alimony where the Trial Court determined that Appellee was "wholly self-supporting"?

2. Did the Trial Court err when it ordered Appellant to pay the mortgage for the former marital home?

3. Did the Trial Court err when it compelled Appellant to pay 100% of the child's calculated expenses for child support, and when it awarded retroactive child support to Appellee?

4. Did the Trial Court err in determining marital property and calculating a monetary award?

5. Did the Trial Court err in including dissipated assets of $216,866.98 in calculating marital property and the monetary award?

6. Did the Trial Court err in determining the attorneys' fees award?

Wife's brief frames the issues as eight Questions Presented:

Continued . . .

court erred in its monetary award analysis; (2) whether the court erred in granting Wife rehabilitative alimony; (3) whether the court erred in awarding Wife child support; and (4) whether the court erred in awarding Wife attorneys' fees. Because we are vacating the monetary award, we must, and do, vacate all four financial awards and remand for further proceedings. We will, however, analyze each issue as guidance on remand.

A. **Because The Circuit Court Erred In Executing The Required Three-Step Process, The Resulting Monetary Award Was Erroneous.**

In one way, the parties have made this case easier for us: they agree that the circuit court erred in how it reached its conclusions about the monetary award. We agree as well.

1. Did the Trial Court abuse its discretion or err in awarding rehabilitative alimony to the Wife?

2. Did the Trial Court abuse its discretion in ordering the Husband to contribute toward the mortgage principal, mortgage interest, and property insurance on the marital home?

3. Did the Trial Court abuse its discretion in ordering the Husband to pay the full costs of the private school tuition for the minor child?

4. Did the Trial Court abuse its discretion in ordering the Husband to pay retroactive child support?

5. Was the Trial Court clearly erroneous in the determination of any marital property decisions?

6. Did the Trial Court abuse its discretion in determining the amount of the monetary award?

7. Was the Trial Court clearly erroneous in determining that the Husband dissipated marital assets, and considering the same in the division of marital property and determination of monetary award?

8. Did the Trial Court abuse its discretion in awarding attorney's fees?

4

Multiple standards of review are at play. *First*, whether property is marital and, if so, its value, are both factual questions that we review for clear error. *Flanagan v. Flanagan*, 181 Md. App. 492, 521 (2008); Md. Rule 8-131(c) ("[A]n appellate court . . . will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."). *Second*, we review the circuit court's legal conclusions *de novo*. *Flanagan*, 181 Md. App. at 521 (*citing Shenk v. Shenk*, 159 Md. App. 548, 554 (2004)). *Third*, we review the circuit court's ultimate decision to grant a monetary award, as well as its amount, for abuse of discretion. *Id.* (*citing Alston v. Alston*, 331 Md. 496, 504 (1993)). In doing so, "'we may not substitute our judgment for that of the fact finder, even if we might have reached a different result . . . .'" *Id.* at 521–22 (*quoting Innerbichler v. Innerbichler*, 132 Md. App. 207, 230 (2000)). And although that review is deferential, we emphasize that the "'trial court must exercise its discretion in accordance with the correct legal standards.'" *Id.* (*quoting Alston*, 331 Md. at 504).

Both parties argue, albeit in different ways, that the court erred in assigning marital property, valuing it, and calculating a monetary award. A monetary award requires a three-step process—the circuit court must: (1) identify the marital property under Md. Code (1999, 2019 Repl. Vol.), § 8-203(a) of the Family Law Article ("FL"); (2) value the marital property under FL § 8-204; and (3) determine whether granting a monetary award would be unfair to one party and, if so, consider the statutory factors under FL § 8-205 and grant a monetary award from that consideration. *Alston*, 331 Md. at 499–500; *Flanagan*, 181 Md. App. at 519–20; *Hoffman v. Hoffman*, 93 Md. App. 704, 712 (1992).

5

In "a proceeding for an annulment or an absolute divorce, if there is a dispute as to whether certain property is marital property, the court shall determine which property is marital property[.]" FL § 8-203(a). Marital property is any property, "however titled, acquired by 1 or both parties during the marriage." FL § 8-201(e)(1). Property that the parties acquire after their divorce, however, is not marital property. *Williams v. Williams*, 71 Md. App. 22, 34 (1987) (*citing Campolattaro v. Campolattaro*, 66 Md. App. 68, 81 (1986), *superseded by rule*, FL § 9-207; *see id.* ("Property acquired by a party up to the date of the divorce, even though the parties are separated, is marital property."). The key word there is "divorce"—so long as they are still married, even if separated or divorcing, property that either acquires is presumptively marital. *Williams*, 71 Md. App. at 34. Likewise, marital property does not include property that the parties acquired before the marriage, property acquired through an inheritance or gift from a third party, property that the parties have excluded through a valid agreement, or property that the court can trace to any of those sources directly. FL § 8-201(e)(3)(i)–(iv).

After determining which property is marital, the court must value it. FL § 8-204(a). The party seeking the monetary award has the burden of proving the value of each item of marital property, and the circuit court makes the final determination about each item's value. *Williams*, 71 Md. App. at 36 (*citing* FL § 8-205(a)). Valuation is not "an exact science," and the court is under no compulsion to accept the values the parties present to it. *Id.*

After identifying the property and valuing it, the court then determines whether to grant a monetary award and must consider eleven factors under FL § 8-205(b). *Alston*, 331

Md. at 509 ("In making a marital property monetary award, a trial judge must weigh the relevant factors in light of the legislative purpose, and then use his or her sound discretion to arrive at an award that is equitable and in accordance with the statute."). Those factors are:

(1)    the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2)    the value of all property interests of each party;

(3)    the economic circumstances of each party at the time the award is to be made;

(4)    the circumstances that contributed to the estrangement of the parties;

(5)    the duration of the marriage;

(6)    the age of each party;

(7)    the physical and mental condition of each party;

(8)    how and when specific marital property or interest in property described in subsection (a)(2) of this section, was acquired, including the effort expended by each party in accumulating the marital property or the interest in property described in subsection (a)(2) of this section, or both;

(9)    the contribution by either party of property described in § 8-201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10)    any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11)    any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in property described in subsection (a)(2) of this section, or both.

FL § 8-205(b).

The statutory steps build on each other, and if the first two aren't completed, we

7

normally must vacate the monetary award and remand. *See Paradiso v. Paradiso*, 88 Md. App. 343, 352 (1991) (remanding partly because court didn't determine whether property was marital, and if so, assign it a monetary value); *see also Freese v. Freese*, 89 Md. App. 144, 150 (1991) ("In order to determine the appropriateness of a monetary award, it is necessary for the trial judge to determine what property is marital property and to assess the value of each item.").

1.    *The circuit court erred in finding Wife's 2017 Volvo and retirement asset as nonmarital property because the parties acquired these two assets during their marriage.*

The parties married on September 29, 1996, and separated in January 2020. The judgment for absolute divorce that terminated their union was docketed on October 8, 2024. The property they acquired from the date of their marriage to the date of their divorce is marital.

In its oral ruling, the circuit court stated that everything the parties acquired was marital. Although that included property the parties acquired after their separation, the court stated that it would not consider that later-acquired property for the monetary award. In addition, the court stated in the order for judgment of absolute divorce that "assets, acquired after the date of separation and after February 1, 2020, are *deemed not marital*, to include: . . . c. [Wife's] Noah's Ark Investment Plan [("NAV")] d. [Wife's] 2017 Volvo vehicle . . . ." (emphasis added). For our purposes, the order for judgment of absolute divorce is the judgment, not the oral ruling. *See* Md. Rule 2-601(a)(1) ("Each judgment shall be set forth on a separate document . . . ."); *see also Taha v. S. Mgmt. Corp.*, 367 Md. 564, 570 (2002) ("[A]n oral comment by the trial judge contained in the record is

8

insufficient to create a final judgment." (*citing Estep v. Georgetown Leather Design*, 320 Md. 277, 284 (1990)).

In this Court, Husband argues that the court erred in categorizing those two assets as nonmarital property. Wife argues that although the court could have found these two assets as marital, it didn't need to, despite the parties agreeing that the two assets were marital in the Rule 9-207 statement they submitted to the court. Husband is correct.

As the statute states, step one of the three-step process concerns "a dispute as to whether certain property is marital property . . . ." FL § 8-203(a). Parties can resolve disputes independently about which of their property is not marital and exclude that property from court consideration, even if it meets the marital property definition. *Flanagan*, 181 Md. App. at 531–32. They can do this by agreement, such as in a Rule 9-207 statement. *Id.*; FL § 8-201(e)(3)(iii). In this case, the parties had agreed that Wife's 2017 Volvo and NAV were marital property, but the court found otherwise. The court relied on *Alston v. Alston*, 331 Md. 496 (1993) in bifurcating the assets acquired after the marriage but before the separation date, and the assets acquired after the separation date to the date of divorce. This reliance was misplaced.

*Alston v. Alston* concerned a spouse who won a million-dollar lottery annuity several days before his deadline to answer his wife's complaint for absolute divorce. 331 Md. at 500–03. The court granted the wife a divorce and a monetary award and divided the parties' marital property, including the lottery win, equally. *Id.* at 503. The husband appealed, challenging whether the court should have included the lottery money in the monetary award. *Id.* at 503–04. Our Supreme Court held that although the lottery proceeds were

marital property, that by itself didn't render them subject to equitable division. *Id.* at 505, 507–09. The court reasoned that although each case requires an independent assessment, some FL § 8-205(b) factors may be entitled to more weight:

> While no hard and fast rule can be laid down, and while each case must depend upon its own circumstances to insure that equity be accomplished, generally in a case such as this the eighth factor should be given greater weight than the others. Where one party, wholly through his or her own efforts, and without any direct or indirect contribution by the other, acquires a specific item of marital property after the parties have separated and after the marital family has, as a practical matter, ceased to exist, a monetary award representing an equal division of that particular property would not ordinarily be consonant with the history and purpose of the statute.

*Id.* at 507. In that case, the circuit court had found that the husband acquired the lottery ticket by expending his own time, effort, and money. *Id.* The Supreme Court distinguished that situation from one where a spouse facilitates another spouse to acquire property directly or indirectly. *Id.* at 507–08. It noted how the husband's purchase was independent of the wife's efforts and their lives together, past and present. *Id.* at 508. Indeed, their marriage was practically over when he purchased the ticket, and the Court held that the circuit court erred in awarding half of the lottery winnings to the wife automatically. *Id.* at 508–09.

We discussed *Alston* in *Ware v. Ware*, 131 Md. App. 207 (2000). Like *Alston*, the husband in *Ware* also won the lottery but did not want it included in the court's monetary award calculation. 131 Md. App. at 213. Although everyone agreed that the winnings were marital property, as in *Alston*, we emphasized that the Supreme Court "did not announce a rule of law that after-acquired gambling winnings are not marital property or are not subject

10

to a monetary award." *Id.* at 217. The errors the Court pointed out in *Alston* were the circuit court's failure to assess the FL § 8-205(b) factors, to afford the relevant factors the appropriate weight, and not to differentiate between what was equitable and equal on those facts:

> The more, moderate holding that we extract from the *Alston* opinion is that the trial judge, albeit possessing discretion even under the *Alston* facts, abused his discretion in two separate regards. He failed to give proper weight, in a situation such as this involving after-acquired gambling winnings, to the so-called eighth factor. He also mechanistically failed to distinguish an "equitable" distribution from an "equal" distribution.

*Id.* at 218.

These cases teach us that not all marital property necessarily will be subject to equitable distribution when awarding a monetary award. *See Alston*, 331 Md. at 508–09. But that calculation begins from the understanding that the court first had identified which property was marital. *Freese*, 89 Md. App. at 150. Where it is unclear that the court completed that step, we have vacated the monetary award and remanded. *See id.* at 152 (circuit court didn't complete three-step process entirely, including overlooking husband's bank account, which contained marital funds, warranting remand); *see also Kelly v. Kelly*, 153 Md. App. 260, 273 (2003) (circuit court's exclusion of marital property that should have been considered in step one of the three-step process was improper); *see also Hoffman*, 93 Md. App. at 717 (while circuit court stated value of marital property and personal property, this Court could not decipher which personal property was marital, if any, as three-step process requires, warranting remand).

11

Back to this case. In their Rule 9-207 statement, both parties agreed that Wife's 2017 Volvo was marital property and the parties provided evidence to support this categorization. Husband testified that he purchased the vehicle during the 2016–17 period, during the parties' marriage and before separation. He also testified that he made monthly payments on the vehicle. Leading up to the trial and during discovery, Husband identified the vehicle in his answers to interrogatories as property that he acquired in May 2017 and in which he had an interest. He also identified that the vehicle's title was in both his and Wife's names. And Husband testified that he finalized the monthly payments on the vehicle during the parties' separation, meaning that the vehicle no longer had any encumbrances, as reflected in the Rule 9-207 Statement.

Wife agreed. She testified that she still drives the vehicle and that it is titled jointly. This evidence leads to only one conclusion: the vehicle was marital property and the circuit court erred in finding otherwise. The only evidence the court received suggesting that this vehicle could be nonmarital was that the vehicle was not fully paid off before the parties separated. But even then, unlike in *Alston*, Husband continued to make monthly payments on the vehicle even after the parties separated, and because he had no issue transferring his share in the vehicle over to Wife, he facilitated her direct acquisition of the vehicle. *Cf.* 331 Md. at 507–08. The finding that the vehicle was nonmarital property was clearly erroneous.

As in *Alston*, the court "must weigh the relevant factors in light of the legislative purpose, and then use [its] sound discretion to arrive at an award that is equitable and in accordance with the statute." 331 Md. at 509. Drawing an arbitrary line on the date of separation doesn't account fully for the contributions either party might have made to the

property acquired post-separation. Take, for example, the 2017 Volvo. Husband testified that while the family acquired the vehicle in 2017, he made the final monthly payment after the separation date. We faced a similar situation in *Gravenstine v. Gravenstine*, 58 Md. App. 158 (1984). That case concerned a vehicle the husband purchased for $7,700 after the parties separated. *Id.* at 180. At trial, he testified that he had paid $1,700 as a down payment for the vehicle, financed the remainder, and had paid $3,000 of the vehicle's debt leading up to the trial. *Id.* The circuit court found the entire vehicle to be marital property and assigned it the full $7,700 value. *Id.* We remanded, instructing the circuit court to value the vehicle at $4,700 because there was still a $3,000 debt on the vehicle at the time of trial that had not been satisfied. *Id.* Applied to the case here, property not yet fully acquired (i.e., paid off) until after separation, like Wife's 2017 Volvo, can still be marital and calculated into a monetary award analysis.

Wife's NAV requires a similar analysis. Like the 2017 Volvo, the parties provided ample evidence that this property was marital. The court found that the NAV was nonmarital because it was "acquired after the date of separation and after February 1, 2020 . . . ." But the Rule 9-207 Statement stipulated it as marital. Wife also testified that she began working with Noah's Ark, which provided the NAV, in December 2019, before the parties separated. She worked there until November 2021, and while there, she contributed to her NAV. There was more than enough evidence for the court to find that, at a minimum, the portion of the funds contributed before the separation date was marital. Labeling it otherwise was error, at least in categorical terms.

On remand, the circuit court might yet find that Wife's NAV is marital, but that part

of the asset is not subject to equitable distribution. As in *Alston*, the court could determine that the contributions Wife made after the separation came at a time when "the marriage was, for all practical purposes, over." 331 Md. at 508. In that circumstance, subject to the court giving due regard to all the relevant factors, the portion of the asset acquired during that time may not be subject to equitable distribution, but this record contains no findings to that effect or a way for us to see that those findings might have been contemplated.

Wife also contends that the court didn't address other assets that the parties stipulated as marital. These were Husband's Booz Allen Hamilton Stock Options held in Fidelity Investment #6226 and personal property at Husband's residence. Like Wife's 2017 Volvo and NAV, the circuit court should determine on remand whether these assets were marital, if at all, before awarding a monetary award. *Hoffman*, 93 Md. App. at 713–14.

### 2. *The circuit court erred in valuing other assets.*

On remand, the court also should review the valuation of the MidAtlantic IRA asset, the parties' bank accounts, the total marital property valuation, and the court's dissipation calculation. Beginning with the parties' MidAtlantic IRA, the parties agree that the order before us double-counted the MidAtlantic IRA. We agree as well.

### a. The circuit court valued erroneously the parties' MidAtlantic IRA and bank accounts.

Husband listed the MidAtlantic IRA in the Rule 9-207 Statement. Through his trial testimony, he explained that this is a self-directed IRA containing three core investments: $150,000 in Dark Cubed, a cybersecurity firm; $50,000 in Gatsby Ballpark, LLC ("Gatsby's"); and $50,000 in Dauphine's restaurant group ("Dauphine's"). He added

14

that he could not liquidate those assets until those investments returned the invested value back into the IRA, or in other words, until the assets became profitable. Further, he testified that he does not have any separate investments related to the MidAtlantic IRA. Apart from Dark Cubed, to which Wife testified that the initial investment was for $100,000, she testified to the same amounts as Husband regarding Gatsby's and Dauphine's. Notably, however, she did not dispute that Dark Cubed, Gatsby's, and Dauphine's were all part of the MidAtlantic IRA. Indeed, she testified that she and Husband made the three investments "through the self-directed IRA."

The court reached a different conclusion. The court identified Dark Cubed, Gatsby's, and Dauphine's as marital property that Husband was to retain and assigned each the values to which Husband testified. The court then found the MidAtlantic IRA valued at $250,000 to be "equally divided and distributed to the parties on an *if, as, and when*, distribution, including gains and losses." These two conclusions are inconsistent because Husband could not retain the entire asset while dividing it equally with Wife. By treating the asset this way, the court counted it twice in the marital property valuation. On this record, this decision was clearly erroneous.

In addition, the calculation didn't assign values to the parties' bank accounts despite finding that each party's accounts were marital property. Both parties agree that the court failed to treat these accounts as marital property and asserted values that the court should have used. On remand, the court should value their bank accounts as part of the monetary award analysis:

15

| BANK ACCOUNT | HUSBAND | WIFE[2] |
|---|---|---|
| Ally 8989 | $7,825 | $7,825 |
| Ally 4762 | $3 | $4 |
| USAA 0436 | $13 | $14 |
| USAA 3981 | $220 | $221 |
| USAA 5678 | $466 | $466 |
| USAA 2646 | $2,223 | $2,223 |
| Sandy Spring 0154 | $5,000 | $5,000 |
| USAA 0444 | $25 | $25 |
| **Total** | **$ 15,775** | **$ 15,778** |

### b. The circuit court erred in its total marital property valuation.

Although the parties agree that the circuit court calculated their marital estate erroneously, Husband and Wife differ on how the court reached its sum. Husband submits what he believes should have been the correct calculation whereas Wife describes a number of errors as "*de minimis*" and suggests that we overlook them. Because we are remanding anyway, we will address several items that were excluded from this calculation and warrant recalculation.

The circuit court intended to divide the marital estate into retirement and non-retirement marital property. We glean this from the court's statement that the parties' retirement benefits totaling $498,431.62 were to be divided on an if, as, and when basis

---

[2] Although some of Wife's values differ, Wife concedes that "the values suggested by the Husband are acceptable to the Wife (Appellant's Brief, p.23)." The circuit court still must assign the ultimate values. *Williams*, 71 Md. App. at 36.

and distributed on a plus or minus investment experience. This differs from the non-retirement estate, which the court simply divided.

When valuing retirement assets, the circuit court has three options: (1) consider the amount of contributions the earning spouse made to the retirement fund, then award the non-contributing spouse an appropriate share; (2) calculate the asset's present value, discounting benefits payable in the future for interest, mortality, and vesting; or (3) assign a fixed percentage of the future benefits to the non-contributing spouse and award them that percentage of the future benefits on an if, as, and when paid basis. *Deering v. Deering*, 292 Md. 115, 130–31 (1981) (citation omitted). Under this last approach, the court need not value the retirement assets unless a party objects to it. FL § 8-204(b).

The court identified the marital retirement assets as: (1) Animal World (401K), valued at $4,048.06; (2) Vanguard IRA, valued at $39,114.38; (3) MidAtlantic IRA, valued at $250,000.06; (4) Fidelity Investment 457b Plan, valued at $44,078.31; (5) Booz Allen Hamilton Fidelity Investment #6226, valued at $16,496.16; (6) Equitable Life Operations, valued at $94,694.65; (7) Dark Cubed, valued at $150,000; (8) Gatsby's, valued at $50,000; and (9) Dauphine's, valued at $50,000. This calculation is reflected below:

| RETIREMENT ASSET | CIRCUIT COURT'S VALUATION FINDING |
|---|---|
| Animal World (401K) | $4,048.06 |
| Vanguard IRA | $39,114.38 |
| MidAtlantic IRA | $250,000.06, to be divided if, as, and when |
| Fidelity Investment 457b Plan | $44,078.31 |
| Booz Allen Hamilton Fidelity Investment #6226 | $16,496.16 |
| Equitable Life Operations | $94,694.65 |
| Dark Cubed | $150,000 |
| Gatsby's | $50,000 |
| Dauphine's | $50,000 |
| **CIRCUIT COURT'S TOTAL** | $498,431.62 |

On remand, the court should identify which of the three valuation methods it is employing. The court stated in its oral ruling that the parties should divide equally all their marital retirement assets as of February 1, 2020, on an if, as, and when basis. That means that once payable, Husband and Wife each would get fifty percent of the retirement assets. But then the court valued those assets based on later-acquired dates (after February 1, 2020). The court also included an asset acquired after that date, the Vanguard IRA. In the parties' judgment of absolute divorce, the court ordered that the parties divide the retirement estate as of February 1, 2020, equally excluding the MidAtlantic IRA, which would be distributed if, as, and when. The oral ruling does not track the order explicitly, insofar as Husband and Wife could get an equal distribution of those assets if, as, and when, but the court was explicit in clarifying that only the MidAtlantic IRA was distributable if, as, and when. On remand, the court should clarify which valuation method it is using and

the operative valuation dates.

Additionally, as discussed above, the court considered the MidAtlantic IRA once by distributing it solely to Husband *and* then as a separate asset to be divided between the parties on an if, as, and when basis. Further, as seen in the table, the court treated that asset as separate from Dark Cubed, Gatsby's, and Dauphine's. On remand, that asset shouldn't be considered twice. Suppose the court uses the present value evaluation method, removing the MidAtlantic IRA from the calculation above reduces the court's $498,431.62 value to $198,431.56. That then leaves the excluded retirement assets: Wife's NAV, which the parties valued at $29,302.39 as of December 31, 2023, and Husband's Booz Allen Hamilton Stock Options held in Fidelity Investment #6226, which Husband valued at $40,188.66 as of March 31, 2024.

With regard to the non-retirement marital estate, the circuit court found that the total value of the parties' marital property was $1,301,525.98. This marital estate was comprised of the following items that the court identified as marital property: (1) Subaru in Wife's and son's name, valued at $1,000; (2) Evermay LLC, which the court found dissipated; (3) Advice Lab LLC, which the court found dissipated; (4) Dark Cubed, valued at $150,000; (5) Gatsby's, valued at $50,000; (6) Husband's weapons, valued at $50,000; (7) Kia in Husband's and son's names, valued at $7,700; (8) Wife's HSA account, valued at $7,600; (9) furniture in the marital home, valued at $30,000; and (10) the parties' marital home, valued at $788,359. This property is reflected below:

19

| NON-RETIREMENT MARITAL ASSET | CIRCUIT COURT'S VALUATION FINDING |
|---|---|
| Subaru in Wife's and son's names | $1,000 |
| Evermay LLC | Dissipated asset[3] |
| Advice Lab LLC | Dissipated asset |
| Dark Cubed | $150,000 |
| Gatsby's | $50,000 |
| Husband's weapons | $50,000 |
| Kia in Husband's and son's names | $7,700 |
| Wife's HSA account | $7,600 |
| Furniture in the marital home | $30,000 |
| Marital home | $788,359 |
| **CIRCUIT COURT'S TOTAL** | $1,301,525.98 |

Although the court reached the $1,301,525.98 figure from adding those values, the total should have been $1,799,957.60. The gap between $1,301,525.98 and $1,799,957.60 is equal to the value that the court assigned to the parties' retirement assets: $498,431.62. While the court certainly could distribute the retirement assets separately, the court must consider all marital assets before moving to step three in the monetary award analysis. The parties submit that the court's inclusion of part of the MidAtlantic IRA, namely the Dark Cubed and Gatsby's values, led to the $200,000 inflation, resulting in the circuit court's $1,301,525.98 figure. Although that might account for the $200,000 inflation, on remand, the court may yet need to account for the 2017 Volvo, the parties' bank accounts, and personal property at Husband's residence, which, as we noted above, may bear on the total

---

[3] For the dissipated assets, the circuit court assigned them a total value of $216,866.98.

20

non-retirement marital estate.

### c.     <u>The circuit court erred in its dissipation analysis.</u>

Husband argues as well that the circuit court erred in finding that he dissipated any assets before February 1, 2020, because he was paying the marital expenses for Wife and their youngest child. He adds that any dissipation the court may have included that occurred after February 1, 2020, was considered wrongly, as the court denied Wife's dissipation claim after February 1, 2020, and Wife didn't offer proof supporting dissipation after that date. Wife counters that the circuit court was correct in finding that she established her prima facie dissipation claim and that the burden then shifted to Husband, who failed to prove that his expenditures were appropriate and not dissipation.

"[P]roperty disposed of before commencement of the trial under most circumstances cannot be marital property." *Gravenstine*, 58 Md. App. at 177. That said, it "would clearly be against the Legislature's stated public policy to permit one spouse to squander marital property and render it impossible to make an equitable award of property." *Sharp v. Sharp*, 58 Md. App. 386, 399 (1984). A party who has expended marital assets in this way can be found to have dissipated them. *McCleary v. McCleary*, 150 Md. App. 448, 462–63 (2002) (citation omitted). Dissipation may be found when a spouse expends marital funds for their own benefit "for a purpose unrelated to the marriage at a time where the marriage is undergoing an irreconcilable breakdown." *Sharp*, 58 Md. App. at 401. It also may be found where the alleged dissipator expended marital funds for a principal purpose other than "'reducing the amount of funds that would be available for equitable distribution at the time of the divorce.'" *Omayaka v. Omayaka*, 417 Md. 643, 652 (2011) (*quoting Welsh v.*

*Welsh*, 135 Md. App. 29, 51 (2000)). And dissipation may occur where the marriage is not undergoing an irreconcilable breakdown. *Id.*

The dissipation claimant has the initial burden of production and the ultimate burden of persuasion. *Jeffcoat v. Jeffcoat*, 102 Md. App. 301, 311 (1994) (*citing Choate v. Choate*, 97 Md. App. 347, 366 (1993), *disapproved of on other grounds by Welsh*, 135 Md. App. at 54). After establishing a prima facie dissipation case, the burden shifts to the alleged dissipator to show that their expenditures were appropriate. *Id.* "'What matters is not that one spouse has, post-separation, expended some of the marital assets, what is critically important is the purpose behind the expenditure.'" *Omayaka*, 417 Md. at 654 (*quoting Heger v. Heger*, 184 Md. App. 83, 96 (2009)). After the alleged dissipator provides evidence that the expenditure was appropriate, it is up to the circuit court to determine whether the dissipation claimant has proven that the alleged dissipator did indeed dissipate marital assets. *Abdullahi v. Zainini*, 241 Md. App. 372, 418 (2019); *see Omayaka*, 417 Md. at 656 ("[T]he ultimate burden of persuasion remains on the party who claims that the other party has dissipated marital assets.").

The standard of proof is a preponderance of the evidence. *Jeffcoat*, 102 Md. App. at 307. A dissipation claimant may establish prima facie dissipation through proof that the alleged dissipator withdrew sizable funds from bank accounts in their control. *Omayaka*, 417 Md. at 656–57. But even in those cases, a spouse still retains the right to transfer their own property, even if it leaves the spouse with no means of supporting their family, so long as the spouse does so in good faith and without the intention of avoiding divorce consequences. *Oles Envelope Corp. v. Oles*, 193 Md. 79, 88 (1949) (*citing Feigley v.*

22

*Feigley*, 7 Md. 537, 561 (1855)). Ultimately, the circuit court must decide whether the claimant met their burden. *See Abdullahi*, 241 Md. App. at 417 (circuit court erred in finding that wife hadn't made a prima facie dissipation case where husband withdrew $39,000 in one year from bank account).

There may be cases when a spouse dissipated a marital asset fully. In those cases, valuing the property may be difficult, and the circuit court may rely on the property's value at the time that the spouse dissipated it. *Karmand v. Karmand*, 145 Md. App. 317, 345 (2002) (*citing Hollander v. Hollander*, 89 Md. App. 156, 170 (1991)). "To hold otherwise would permit a party who intentionally causes the dissipation to escape the consequences of his actions and would, in most instances, completely deprive the other party from the rightful benefits to which he or she may be entitled." *Hollander*, 89 Md. App. at 170. And once the circuit court determines that a spouse dissipated marital assets, the court must consider the dissipated assets as extant marital property and then value it with the other marital property. *Sharp*, 58 Md. App. at 398–99.

In its order for judgment of divorce in this case, the circuit court, while granting Wife's claim for dissipation occurring at some point in the marriage, denied Wife's claim for dissipation occurring after February 1, 2020. In its oral ruling, the court stated that it would calculate the dissipation from the time that the marriage was irreconcilable. As the court put it, Wife tried to reconcile with Husband in January 2020, but he refused. It was then that Husband did not discuss with Wife the funds he used and on what he spent them, and the court stated that those funds were used for extramarital purposes. The court only identified Evermay LLC and Advice Lab LLC as the dissipated assets, totaling

23

$216,866.98. These findings were clearly erroneous.

Evermay LLC was a company at which Husband worked and later owned for six-and-a-half years. Husband shut the company down in 2018. Wife contends that because Husband testified to shutting the business down with outstanding billing over $270,000, that decision didn't serve marital purposes and, therefore, constituted dissipation. For our purposes, we must consider whether, given the court's finding that the dissipation occurred when the marriage was irreconcilable, the decision to shut down Evermay occurred during that time.

It didn't. The court identified a time period where Wife tried to reconcile with Husband, and he refused. But that occurred in January 2020, when Husband told Wife that he wanted a divorce and left the marital home. Before that, Husband had separated from Wife, but only once. This was in October 2019, when, after revealing his infidelity, Husband informed her that their marriage was over, something he had said before. Although he left for three weeks in November 2019, he returned to the marital home and the parties attempted to reconcile. Wife testified to this, revealing her efforts to be more diligent about Husband's desires, and both testified to the guidance they received from counselors. The court found as much. But Evermay ceased to exist in 2018, meaning it could not have been dissipated in the manner the court found.

As for Advice Lab LLC, Husband testified that this was a shell company that had no monetary value to it. He doesn't dispute that it retained a bank account from Sandy Spring Bank with funds in it. Still, the transactions from that account occurred after February 1, 2020—the period after which the court found no dissipation. The bank

statement from Sandy Spring as of January 31, 2020, reflected a value of $1,793.38. Without more, this appears to be the only value available for dissipation. We cannot say how the court reached the $216,866.98 figure. And since the court didn't identify any other dissipated assets, on remand, the court is free to identify which assets were dissipated, if any, and assign to them a monetary value as marital property.

At trial, Wife asked the court to find that Husband had dissipated $547,254.13 and about $200,000 of funds from the Booz Allen Hamilton Fidelity Investment #6226 account. She requested that once treated as extant marital property, the court should assign the dissipated property a value and award half of it to her. Because the court found no dissipation after February 1, 2020, the court will need to reexamine these figures.

*First*, the $547,254.13 does not line up neatly. Wife came to that total by assigning $281,243.17 to Husband's affair; $81,306.30 to his travel; $125,468.16 to his dining; $93,613 to cash withdrawals; and $13,028.17 to liquor purchases. But this formulation included expenditures that occurred after February 1, 2020. If, for example, the court excises the travel expenditures that occurred before February 1, 2020, the $81,306.30 for travel drops to $3,308.69. And that reduced figure would include the Nemacolin reservation, which Wife testified occurred during the time the parties were trying to reconcile, and that Nemacolin was where the parties went and spent several days together. Removing that expenditure would lower the travel figure to $2,588.60 because it was for marital purposes, i.e., their reconciliation.

*Second*, and in like manner, the $200,000 Fidelity retirement withdrawals are irrelevant. The statements available from that account begin in July 2021 and end in

25

December 2023. Wife identified these statements as proving dissipation, since the money was not spent on their family. But since the circuit court denied her dissipation claim for the period after February 1, 2020, the court disagreed with Wife on that point. And although we are not examining that decision, we include it here to highlight that those withdrawals should not be included in the dissipation calculation, just as the court found. The court will need to explain how, after excluding all these figures, it reached $216,866.98.

On remand, the court may find that by providing evidence of withdrawals occurring before February 1, 2020, Wife established a prima facie dissipation claim. *See Omayaka*, 417 Md. at 656. In that case, Husband would then need to demonstrate that those withdrawals were appropriate, *Abdullahi*, 241 Md. App. at 418, and the court should, if inclined to agree with Wife, tie those funds to the alleged dissipation. *See Gravenstine*, 58 Md. App. at 178 (because $10,000 withdrawn from joint account three years before divorce could not be traced to any property spouses owned at time of divorce, circuit court could not treat funds as extant marital property); *see also McCleary*, 150 Md. App. at 464–66 (holding circuit court's dissipation finding clearly erroneous because circuit court did not examine whether expenditures were for familial purposes and included payments for household and family expenses in dissipation calculation).

3.  *Because the circuit court did not account for various assets and miscalculated the parties' marital estate, it erred in reaching its monetary award conclusion.*

After deciding the scope and value of the marital property, the question, measured against the FL § 8-205(b) factors, is whether a monetary award is appropriate to address inequity between the parties. *Hoffman*, 93 Md. App. at 712. Although the court intended to

award Wife 65% of the non-retirement marital estate (which the court found as $1,301,525.98), it awarded Wife $843,473.38. This award included the equity in the marital home, which the court valued at $788,359. But 65% of $1,301,525.98 is $845,991.89, not $843,473.38. The circuit court's findings on this matter were clearly erroneous.

Husband argues that the court did not "properly account for [the marital home's] full allocation to [Wife] in determining the monetary award." But the court did subtract the value assigned to the marital home from Wife's monetary award, leaving Husband to pay $55,114.38, not $843,473.38, let alone $845,991.89. This was not an error inasmuch as it reduced the ultimate outlay by the value of the full equity in the house ($843,473.38 minus $788,359 equals $55,114.38). On remand, we emphasize only that it is for the court to consider the FL § 8-205(b) factors based on the evidence, including the parties' Rule 9-207 statement, and determine what is equitable: "Of course, equal distribution may often be proper, and where that result is equitable and consistent with the legislative purpose, [the] court should not hesitate to make such an award." *Alston*, 331 Md. at 509.

### B. Given That Some of The Circuit Court's Findings Were Clearly Erroneous When Awarding Wife Rehabilitative Alimony, The Court Erred.

Our holding regarding the monetary award, on its own, requires us to vacate the circuit court's alimony award. *See Long v. Long*, 129 Md. App. 554, 585 (2000) ("Our law weighs alimony and monetary awards against one another."). But in light of Husband's challenges to that award, we offer some guidance so that the issues aren't relitigated from scratch.

As with the monetary award, our review of the alimony award "'assume[s] the truth

of all evidence tending to support the findings of the trial court, and . . . simply inquire[s] "whether there is any evidence legally sufficient to support those findings."'" *Id.* at 556–57 (*quoting Skrabak v. Skrabak*, 108 Md. App. 633, 650 (1996)). "Yet when the [court's] stated findings of fact, *i.e.*, the evidence the court accepts as true for controverted issues, conflicts with the ultimate award of [alimony], we must take a closer look. We do so here, and we now question whether the [court's] findings of fact support [its] conclusions." *Id.* at 567.

"Generally speaking, alimony awards, though authorized by statute, are founded upon notions of equity; equity requires sensitivity to the merits of each individual case without the imposition of bright-line tests." *Tracey v. Tracey*, 328 Md. 380, 393 (1992) (citation omitted). Indeed, the alimony statute "in its entirety renounces an approach based on rote or formula." *Id.* at 389. That said, the statute lists twelve factors that a circuit court must consider before awarding alimony. *Welsh*, 135 Md. App. at 39 (*citing Gallagher v. Gallagher*, 118 Md. App. 567, 586 (1997)). Those factors are:

(1)    the ability of the party seeking alimony to be wholly or partly self-supporting;

(2)    the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3)    the standard of living that the parties established during their marriage;

(4)    the duration of the marriage;

(5)    the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6)    the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties;

(11) the financial needs and financial resources of each party, including:

    (i) all income and assets, including property that does not produce income;

    (ii) any award made under [FL] §§ 8-205 and 8-208 of this article;

    (iii) the nature and amount of the financial obligations of each party; and

    (iv) the right of each party to receive retirement benefits; and

(12) whether the award would cause a spouse who is a resident of a related institution as defined in § 19-301 of the Health-General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.

FL § 11-106(b).

This statutory scheme "generally favors fixed-term or so-called rehabilitative alimony." *Tracey*, 328 Md. at 391; *see Boemio v. Boemio*, 414 Md. 118, 142 (2010) ("'Underlying Maryland's statutory preference is the conviction that the purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently.'" (*quoting Solomon v. Solomon*, 383 Md. 176, 194–95 (2004))); *see also Hull v. Hull*, 83 Md. App. 218, 222–23 (1990) ("[A]limony, when necessary, became essentially short-term and rehabilitative. It was designed primarily to turn the formerly

dependent party into one who, after the rehabilitative steps had been taken, achieved for the first time or reachieved financial self-sufficiency.").

> 1. *The circuit court's findings under FL § 11-102(b)(2) included findings that were clearly erroneous.*

In this case, the circuit court considered the FL § 11-106(b) factors and awarded Wife "rehabilitative alimony in the amount of Two Thousand Five Hundred Dollars ($2,500) per month, for 36 consecutive months" (or three years). To summarize, the court found that:

- Wife, as the party seeking alimony, was wholly self-supporting, FL § 11-106(b)(1);

- Wife could increase her income significantly with palliative care and hospice training and make a substantial living, considering her income had increased annually by $20,000, FL § 11-106(b)(2);

- Before 2014, the parties had a "humble standard of living" and did not live a "lavish lifestyle," but after 2014, when Husband took a private sector job and increased his income, the parties' lifestyle changed as they acquired a new home, and a luxury vehicle; and Husband purchased luxury brand items for Wife, FL § 11-106(b)(3);

- The parties were married for twenty-seven years, but separated for more than four of those, FL § 11-106(b)(4);

- Wife worked part-time during the marriage, caring for the home and children, whereas Husband carried the entire financial load and would help care for the children when he worked from home, FL § 11-106(b)(5);

- Husband's infidelity, a lack of quality time between the parties, and how they outgrew each other caused the parties' estrangement, FL § 11-106(b)(6);

- Wife was forty-nine years old and Husband fifty-one, FL § 11-106(b)(7); both were "fit physically and mentally," FL § 11-106(b)(8);

- Husband can meet his and Wife's needs, FL

30

§ 11-106(b)(9);

- The parties agreed that their youngest child would attend private school. They agree as well that Wife worked when that child was born and homeschooled the child until third grade. As the child's activities increased, Wife stopped working, but she agreed later to return to work. Although there was a dispute whether Husband requested that she return to work full time, there was no dispute that he was okay with her returning if she desired, FL § 11-106(b)(10); and

- Wife's gross income was $194,529 in 2023, and Husband's exceeded one million dollars, FL § 11-106(b)(11).

Husband takes issue with the court's finding on factor two: "the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment." FL §11-106(b)(2). He argues that because Wife presented evidence to the court showing that "she reached the highest level of education for her profession and stated that additional certifications or training would not increase her income," she wasn't eligible for rehabilitative alimony.[4] Wife responds that the court considered correctly all the FL § 11-106(b) factors, especially the second factor. We agree with Husband on this factor.

Wife's testimony about her future earnings contradicts the circuit court's findings, and the findings aren't supported by any other evidence in the record. At trial, Wife testified that she had received her certification in hospice and palliative care. She added that those

---

[4] Although Husband seemed to argue in his principal brief that Wife could not get rehabilitative alimony after a finding that she was wholly self-supporting as a matter of law, he clarified in his reply brief and at oral argument that he was arguing only that on *these facts*, the trial court could not award rehabilitative alimony after finding Wife wholly self-supporting.

two certifications, which would enable her to provide more complete services, would *not* increase her income. She testified as well that she had reached the highest level of education possible in the veterinary profession already and that performing surgeries would not increase her income potential. She acknowledged that one of her previous employers had said she could potentially acquire an ownership interest in the company, but she never received any such offer. Not only that, but in her current employment role, Wife had no proprietary interest in the company's profits. Lastly, Wife testified that she was working the maximum number of hours available to her and that her schedule was typical for veterinarians. On the other hand, Husband testified that Wife could increase her earning potential by conducting surgeries. He argued that based on conversations he had with Wife, he understood those surgeries as a precursor to ownership interests in a veterinary clinic. He surmised that she was reticent to perform those surgeries for fear of making mistakes and risking her license.

Against this record, the circuit court found that Wife could "increase her salary significantly if she had training in palliative care and hospice care . . . ." In awarding her rehabilitative alimony, the court reasoned that the rehabilitative period would allow Wife "to complete additional training and or education in order to increase her salary." There was no evidence before the circuit court supporting these conclusions. Although the court had the authority to assess witnesses and their credibility, these findings don't connect back to any evidence admitted in the case. *See Long*, 129 Md. App. at 581–83 (rehabilitative alimony award inconsistent with factual record where circuit court did not connect projected potential income for wife and ability to retain work with the record); *see also Lee*

32

*v. Lee*, 148 Md. App. 432, 444, 446–47 (2002) (noting that while circuit court thought spouse would benefit economically from taking some college courses, it provided no clue as to why it felt spouse could be self-supporting at end of rehabilitative period or what field of work spouse could engage in to become self-supporting).

The record also doesn't support findings about the surgeries and ownership interest. The court found that Wife could perform surgeries with additional training and that Wife could earn more by "seeing more animals and or choosing to buy into the practice." The court also found that Wife was not "opting for her maximum potential with the company." Again, those findings aren't grounded in the record. The court could have credited Husband's testimony over Wife's. *Coviello v. Coviello*, 91 Md. App. 638, 655 (1992). But even then, Husband testified only that there was some potential to earn more income through the surgeries and offered no proof that this was attainable, as opposed to a mere possibility. Moreover, the circuit court did not identify why the three-year period it prescribed was sufficient to permit Wife to perform surgeries, to increase how frequently she performed surgeries, and what salary she would attain within the three years that would warrant stopping the alimony or render rehabilitation complete. *See Lee*, 148 Md. App. at 446–47.

In addition, Husband seemed to anchor his conclusions about the ownership interest on Wife's conversations with him while the two were still together. Because Wife testified that one of her previous employers provided that potential but that her current employer does not provide her any interest in its profits presently, the circuit court may require further fact-finding on remand to determine if Wife could have a future buy-in potential.

33

Concluding with her work hours, the court did not explain how Wife could see "more animals" despite already working the maximum number of hours she can at her current employer.

This doesn't mean that the court erred in awarding alimony at all, and this opinion shouldn't be read as so holding. We note only that the specific occupational bases the court cited in support of this rehabilitative alimony award contradicted the testimony and aren't supported by the record. Because we are vacating the monetary award, on remand, the court should revisit Wife's alimony request, and should it grant that award, should ground that award in the record before it.

2. *Husband's remaining contentions are ripe for the circuit court's FL § 11-106(b) analysis.*

Husband asserts that other elements of Wife's alimony claim compounded the errors he identifies: (1) anticipated expenses for repairs to the marital home; (2) a monthly payment for Wife's 2017 Volvo and her desire to replace her car every two years; (3) Wife's charitable contributions; and (4) Wife's decision to contribute $1,291.66 to her retirement. We take these in turn.

Husband's first contention fits neatly within the FL § 11-106(b) factors, namely FL § 11-106(b)(11): "The financial needs and financial resources of each party, including: . . . (iii) the nature and amount of the financial obligations of each party[.]" FL § 11-106(b)(11)(b)(iii). Wife asserted that she had financial obligations to repair the marital home, $1,388 for herself and $694.44 for the minor child, totaling $2,082.44. These included repairs to the roof, electrical system, and the home's plumbing. Husband is correct

that Wife did not provide evidence that she had contracted services to address those issues. But in the context of this trial, the circuit court certainly could have found that such evidence was unnecessary because Wife testified extensively about the repairs to the marital home that she had to complete after she and Husband separated. These included a separate roof repair for the garage, for which she received two price quotes. She also received a quote for the roof of the marital home—the roof she seeks to repair. The circuit court could have found her financial statement request for the roof credible, given her experience with procuring price quotes for the garage roof, repairing that roof, and engaging a contractor to obtain another price quote for the roof of the marital home. *Cf. Kingsley v. Kingsley*, 45 Md. App. 199, 211 (1980) (rejecting contention that future inheritance should have been accounted for in alimony award when court received no evidence as to when inheritance would be distributed). Wife also testified that the home's faucets were not working and required repairs. On remand, the circuit court may determine that it received enough evidence to address the home repair issues. Either way, these items are best addressed under FL § 11-106(b)(11)(iii), and the court should tie its alimony award, if granted, explicitly to the expenses that Wife asserts.

Husband's second contention about Wife's 2017 Volvo is without merit. The circuit court stated explicitly that in calculating Wife's alimony, it "did exclude the $850 for the car . . . [t]hat was listed on the financial statement and the deficit was reduced to $2,567.95." This is the same $850 that Husband challenges. Husband's third contention is that Wife's charitable giving is "not a reasonable or justified need supporting a claim for alimony." But this was an appropriate consideration under FL § 11-106(b). On this record,

35

both parties make monthly charitable contributions. On remand, the circuit court should consider Wife's charitable expense, and if the court finds it reasonable, it should connect that finding to the record before it.

In his fourth contention, Husband argues that Wife's decision to contribute to her retirement also inflated her monthly expenses when considering her alimony claim. But this was an appropriate expense for the court to consider. As Wife testified, she doesn't believe she has enough time to build a retirement fund because she worked mostly part-time, and at times not at all, to care for the parties' children. Husband, the parties' primary financial resource, was able to build his retirement continuously throughout the parties' marriage. In pursuing equity, as the statute mandates, the circuit court could have considered this inequity in retirement funds and sought to address it by including this expense in an alimony calculation. *See Tracey*, 328 Md. at 388 ("[T]he statute itself requires that the trial court weigh all factors relevant to 'a fair and equitable award.'" (*quoting* FL § 11-106(b))).

### 3. The circuit court considered appropriately the mortgage payment under FL § 11-106(b)(11)(ii).

This leaves the mortgage payment obligation on the marital home. Husband claims that the circuit court erred in ordering him to pay the mortgage and that the additional payment functioned in essence as a separate alimony award. He adds that it stacked the financial burden against him inequitably, given the monetary, alimony, and child support awards. Wife counters that this decision is permitted under FL § 8-208 explicitly and was thus within the circuit court's discretion. We agree with Wife.

As Wife notes, correctly, the statute authorizes this decision. Section 11-106(b)(11)(ii) recognizes that the circuit court must consider any award it makes under FL § 8-208, and the relevant provision, (c), permits the circuit court to order either or both parties to "pay all or any part of: (1) any mortgage payments or rent; (2) any indebtedness that is related to the property; (3) the cost of maintenance, insurance, assessments, and taxes; or (4) any similar expenses in connection with the property." In its FL § 11-106(b) analysis here, the circuit court recognized this factor and stated it on the record. The court then ordered Husband to pay the mortgage and insurance on the marital home. During the trial, Husband testified that he had paid the parties' monthly mortgage payment since they separated and up through the trial date. That is more than three years of payments. In addition, he did not identify any hindrance that would inhibit him from continuing to pay prospectively. Indeed, his income continued to soar from the time he left the marital home, when he earned $502,609.77 annually, to over a million dollars at the time of trial. The court readily could conclude on this record that Husband was able to pay as he has.

Husband asserts that the financial burden of the monetary, alimony, and child support awards made ordering him to pay the mortgage on the marital home inequitable. But the court was authorized to order it, and the record supports that decision. *See Knott v. Knott*, 146 Md. App. 232, 250 (2002) ("[I]n addition to any order that the noncustodial parent pay direct child support payments, the trial court may order one or both of the parents to contribute to the mortgage on the family home, insurance and taxes." (*citing* FL § 8-208(c))). Even the case Husband relies on to push this argument recognized as much. *Cotter v. Cotter*, 58 Md. App. 529, 542 (1984) (suggesting that on remand, "an award of

indefinite alimony would in no way be inconsistent with a monetary award based upon a distribution of the husband's retirement benefits *if, as and when* he receives them"), *superseded by rule*, FL § 9-207.

The question for the court on remand is how to calculate the parties' relative financial obligations and how to characterize them. The court could, for example, decide to order rehabilitative alimony and include the cost of the mortgage on the marital home in that calculation. There may be other considerations bearing on the fact or amount of an alimony award. The court also could direct Husband to pay the mortgage separately from alimony, or weigh all of that into its calculation of a marital award or, because the minor child lives at home, child support. Each approach has its analytical parameters and limitations depending on what the court seeks to accomplish overall, and the court has broad discretion in how to fashion the ultimate package.

### C. Given Our Monetary Award And Alimony Award Decisions, The Circuit Court Must Recalculate Its Child Support Award.

Husband's next contention regarding the child support order is twofold. *First*, he submits that, given the related orders that the court entered (i.e., alimony), the child support order effectively meant that he would pay 100% of the child's expenses, which would contravene the Income Shares Model. *Second*, he claims that ordering him to pay arrearages did not account for the payments he made leading up to the judgment of divorce. Wife counters the *first* by arguing that the court exercised its discretion appropriately in extrapolating the child support guidelines. She responds to the *second* by contending that Husband received a windfall from the court because she had requested that the arrearages

date back to the date of filing her complaint, and the court awarded them for a period shorter than that. As noted above, we must vacate the child support order based on our other decisions, but we offer some observations for remand.

This is an above-guidelines case. The General Assembly created the guidelines, FL § 12-204(e), based on the Income Shares Model, which relies on the understanding that "'a child should receive the same proportion of parental income, and thereby enjoy the same standard of living, he or she would have experienced had the child's parents remained together.'" *Bagley v. Bagley*, 98 Md. App. 18, 36 (1993) (*quoting Voishan v. Palma*, 327 Md. 318, 322–23 (1992)). The Model "establishes child support obligations based on estimates of the percentage of income that parents in an intact household typically spend on their children." *Id.*; *Voishan*, 327 Md. at 327 ("The legislature has clearly enunciated that the policies of the guidelines are those embodied in the Income Shares Model.").

If the parties' combined monthly adjusted income is under $30,000 (or $360,000 annually), the circuit court must apply the guidelines. *Kaplan v. Kaplan*, 248 Md. App. 358, 387 (2020) (*citing* FL §12-204(e) (amended 2022, 2024)). But where that monthly income exceeds $30,000, the General Assembly "'left the task of awards above the guidelines to the [trial judge] precisely because such awards defied any simple mathematical solution.'" *Id.* (*quoting Smith v. Freeman*, 149 Md. App. 1, 19 (2002)). The court in these cases must "'balance the best interests and needs of the child with the parents' financial ability to meet those needs.'" *Smith*, 149 Md. App. at 20 (*quoting Unkle v. Unkle*, 305 Md. 587, 597 (1986), *superseded by statute*, FL § 12-202). We will not disturb its "discretionary determination as to an appropriate award of child support absent legal error

or abuse of discretion." *Id.*

1. *The court must make explicit findings about the minor child's reasonable expenses.*

Husband argues that the circuit court "ignored the underpinning principles of the Income [Shares] Model Approach to the guidelines" when calculating his child support obligation. We disagree that the court misapplied the principles, but there is a potential error in how the circuit court calculated child support that the court should consider on remand.

Within the Income Shares Model, the court should determine each party's monthly adjusted actual income, combine them to reach a total monthly income, and if it is within the guidelines, locate the child support obligation and divide it amongst the parties in relation to their share of the combined monthly income. *Voishan*, 327 Md. at 323 (citations omitted). On the other hand, "[s]everal factors are relevant in setting child support in an above guidelines case. They include the parties' financial circumstances, the reasonable expenses of the child, and the parties' station in life, their age and physical condition, and expenses in educating the child." *Walker v. Grow*, 170 Md. App. 255, 266 (2006) (cleaned up) (*quoting Smith*, 149 Md. App. at 20). But in those discretionary cases, like those within the guidelines, the rationale behind the guidelines still controls. *Id.* (*quoting Malin v. Mininberg*, 153 Md. App. 358, 410–11 (2003)).

The court here found that the parties' combined monthly income before taxes was $106,686. Husband contends the appropriate figure was $65,265.34 per month, which reflected the parties' monthly income at the time of trial. He's wrong. Husband testified at

40

trial that his income in 2022 and 2023 exceeded one million dollars, respectively. Wife also introduced evidence of Husband's W-2 forms, which showed that his income before taxes exceeded one million dollars in each of those years. The court relied on that evidence.

The court found that Husband's monthly income was $90,496. That figure times twelve months produces an annual salary of $1,085,952. Husband's 2023 W-2 reflects that his earned Medicare Wages and Tips amounted to $1,085,948.17. That figure divided into twelve months results in $90,495.68. The discrepancy with the circuit court's figure comes inferably from the court rounding up to the nearest dollar. So far, so good. The court also found that Wife's monthly income was $16,190. That figure times twelve months produces an annual salary of $194,280. Wife's 2023 W-2 reflected that she earned Medicare Wages and Tips totaling $194,276.66. And the court received extensive testimony as to this figure. Dividing that figure by twelve results in $16,189.72. So again, the discrepancy came from the court rounding to the nearest dollar. Accordingly, the court's finding that the parties' combined monthly income was $106,686 was correct factually (and arithmetically).

The circuit court then factored in the alimony award as income to Wife, as enumerated in the statute. FL § 12-201(c)(2). This award was $2,500 (which we are vacating), so the court added that amount to Wife's monthly income and deducted it from Husband's (because it was his obligation). That adjusted each party's figures: for Wife, $16,190 to $18,690; for Husband, $90,496 to $87,996. The court then determined the ratio of the combined monthly income: 82.5% to Husband ($87,996 divided by $106,686 and rounded to one decimal place) and 17.5% for Wife ($18,690 divided by $106,686 and rounded to one decimal place).

41

As we have retraced the circuit court's path to the child support obligation so far, the court was correct. Where the court may have erred, however, was with the basic child support obligation. The court listed that obligation as $8,293. We cannot say how the court arrived at that number, as its oral ruling doesn't describe the child's expenses. Even more, Wife's financial statements identify the minor child's expenses at $9,526.99 initially and $9,522.05 in her latest financial statement. As Husband points out, this doesn't account for the mortgage payment, for which he is solely responsible. Nevertheless, using the $8,293 figure, the court did factor in the tuition payment obligation despite Husband's contentions to the contrary. These payments are the same as what Wife submitted on her financial expenses sheet ($3,019.94 rounded up to $3,020). This obligation added to the $8,293 figure resulted in a total child support obligation equaling $11,313, as the court found. Using each party's respective share of the combined monthly income, the court determined that Husband's share was $9,333, subtracted the minor child's tuition obligation ($3,020) from it, and found Husband's child support obligation to be $6,313.

On these figures, the court's math panned out. When we say there was potential error, we note only the absence in the record of how the court reached the $8,293 figure. The court's broad discretion could readily have led it to that figure. But on remand, the court should connect the ultimate conclusion (as recalibrated in light of all of these decisions) to the evidence before it, and especially to how the figure addresses the minor child's expenses. *See Walker*, 170 Md. App. at 289 ("'[T]he trial judge should examine the needs of the child in light of the parents' resources and determine the amount of support necessary to ensure that the child's standard of living does not suffer because of the parents'

separation.'" (*quoting Voishan*, 327 Md. at 332)). We reiterate that the minor child "'is entitled to a standard of living that corresponds to the economic position of the parents.'" *Id.* (*quoting Smith*, 149 Md. App. at 23). And in light of our alimony analysis, the court should factor in any alimony award, just as it did here. FL § 12-201(b)(3)(xv).

Because this is an above-guidelines case, the court can consider various expenses and weigh them accordingly. 170 Md. App. at 288 (noting that in an above-guidelines case, circuit court may consider discretionary activities such as camp, music lessons, tutoring, and other programs to determine child support). The award should ensure that even with Husband earning significantly more than Wife, the parties share the child's expenses. *See Lee v. Andochick*, 182 Md. App. 268, 293 (2008) (court abused its discretion in above-guidelines case by awarding wife more in child support than requested in wife's financial statement, indicating that court failed to place any child support burden on wife). And in determining the minor child's expenses, the court should ensure that the child does not get treated differently from their siblings simply because the child is to grow up in a world where the child's parents are divorced. *See Maness v. Sawyer*, 180 Md. App. 295, 321 (2008) (no abuse of discretion in above-guidelines case where despite husband carrying heavy debts, circuit court entered child support order against husband to ensure "that the children were not going to suffer because of the financial indiscipline of their parents"); *see also Bagley*, 98 Md. App. at 38 ("The [parent's] children are entitled to every expense reasonable for a child of someone with [the parent's] affluence.").

2. *The circuit court's decision instituting arrearages starting on May 1, 2024, was an abuse of discretion.*

Husband argues here that the arrearages entered as part of his child support obligation didn't account for the expenses he paid before the circuit court entered its judgment. We disagree, but there is another consideration for the court to address on remand.

Although "retroactive support is allowed, it is by no means mandatory." *Caccamise v. Caccamise*, 130 Md. App. 505, 518 (2000). Deciding whether to grant retroactive child support falls within a circuit court's discretion. *Petitto v. Petitto*, 147 Md. App. 280, 310 (2002). A court abuses its discretion when its decision is "'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Sumpter v. Sumpter*, 436 Md. 74, 85 (2013) (*quoting North v. North*, 102 Md. App. 1, 14 (1994)).

Section 12-101(a) mandates that: "Unless the court finds from the evidence that the amount of the award will produce an inequitable result, for an initial pleading that requests child support pendente lite, the court *shall* award child support for a period from the filing of the pleading that requests child support." FL § 12-101(a)(1) (emphasis added). As for other pleadings that seek child support, a circuit "court *may* award child support for a period from the filing of the pleading that requests child support." FL § 12-101(a)(3) (emphasis added). Essentially, "section 12-101(a)(3) leaves to the discretion of the court that which section 12-101(a)(1) makes mandatory." *Chimes v. Michael*, 131 Md. App. 271, 295 (2000).

Wife, in her complaint, requested child support "*pendente lite* and as long as permitted by law, retroactive to the filing in this case . . . ." The court also entered a *pendente lite* order awarding Wife child support of $1,000 per month. Wife argued before the circuit court that her basis for child support arrearages was that Husband did not start paying child support until the *pendente lite* order. Even after he started to make the *pendente lite* child support payments, those payments did not include arrearages that dated back to the filing of her complaint. Nevertheless, and despite Husband's contentions that he did pay some of the minor child's expenses after Wife filed her complaint for divorce, the court found that Husband had paid part of the mortgage on the marital home, child support from the *pendente lite* order, and the minor child's private school tuition once Wife filed for divorce. As a result, the court declined to order arrearages dating back to the date Wife filed her complaint. Instead, the court ordered that Husband: (1) pay Wife child support arrearages amounting to $12,626 dating back to May 1, 2024; (2) credited Husband for payments made totaling $2,000; and ordered that Husband was to pay $500 monthly in addition to his child support obligation until Husband pays the arrearages in full. The court abused its discretion.

The statute's language is unambiguous. The court must award the child support retroactively from the date Wife filed her initial pleading unless the court finds that the award would create an inequitable result. FL § 12-101(a)(1). Because the court ordered child support retroactively from May 1, 2024 and not the date Wife filed her complaint, November 28, 2022, it found implicitly an inequitable result. And yet the court didn't explain why commencing the child support retroactively from the date of Wife's initial

pleading would yield an inequitable result. In light of our other holdings, the court, on remand, may determine that the monetary and alimony awards, if granted, aggregated with the child support award, yield an inequitable result. On that basis, the court may decide to have the child support obligation commence later—if, perhaps, it decides to calculate child support as encompassing (or, perhaps, supplementing) Husband's obligation to pay the mortgage on the marital home and the home's related fees. *Knott*, 146 Md. App. 250.

### D. With The Related Pecuniary Awards Vacated, We Vacate Also The Attorneys' Fees Award.

Husband asserts that the court abused its discretion here by awarding Wife attorneys' fees. Wife asks us to affirm, reasoning that the court didn't abuse its discretion. We shall not get to the merits here, however, because the case law on this matter compels us to only one conclusion: where we vacate—as we did here—a monetary award, alimony, or child support, we shall also vacate the attorneys' fees award. *Flanagan*, 181 Md. App. at 544 ("Because we have vacated the monetary award, the award of attorneys' fees must necessarily be vacated and reconsidered on remand as well."); *Freese*, 89 Md. App. at 155 ("Although the award of alimony as made does not constitute an abuse of discretion, we are vacating the alimony award since a change in the monetary award may affect a change in the alimony award."); *St. Cyr v. St. Cyr.*, 228 Md. App. 163, 198 (2016) ("[A] court's determinations as to alimony, child support, monetary awards, and counsel fees involve overlapping evaluations of the parties' financial circumstances."); *Brown v. Brown*, 195 Md. App. 72, 122 (2010) ("'The factors underlying alimony, a monetary award, and counsel fees are so interrelated that, when a trial court considers a claim for any one of

46

them, it must weigh the award of any other.'" (*quoting Turner v. Turner*, 147 Md. App. 350, 400 (2002))).

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY.**